[Civ. No. 8595.   Third Dist.   June 3, 1955.]

FRED J. CARON et al., Plaintiffs, v. PARLEY G. AN-
DREW et al., Defendants; H. H. GRIMES et al.,
Cross-complainants and Appellants; ENRICO PICCHI
et al., Respondents; FARM SERVICE COMPANY (a
Corporation), Cross-defendant and Appellant.

J. Kingsley Chadeayne for Cross-complainants and Appellants.

Aiken, Kramer & Aiken and Bauer E. Kramer for Cross-defendant and Appellant.

Rutherford, Jacobs, Cavalero & Dietrich for Respondents.

VAN DYKE, P. J.—In July, 1950, H. H. Grimes and Fred E. Picchi were engaged in purchasing a tract of land known as the "Hunt Ranch" in San Joaquin County. It comprised 759 acres of land located on the east side of the San Joaquin

River and between that river and Walthall Slough. They intended to own the land severally. While the purchase was being consummated Grimes and Picchi entered into a contract with Andrew Brothers, a copartnership, whereunder the parties contracted for the leveling of the entire ranch by Andrew Brothers; the work to be finished by December 1, 1950. Shortly after this contract was signed, the property was acquired, the title being taken in two groups of people, one group headed by H. H. Grimes, the other by Fred Picchi. Hereafter we shall refer to the Grimes group as "Grimes," to the Picchi group as "Picchi" and to the Andrew Brothers as "Andrews." Farm Service Company, a corporation, hereafter called "Farm Service," guaranteed the faithful performance of the work by Andrews, the penalty of the bond being in the amount of $26,000, one-half the contract price for the leveling. Andrews entered upon the performance of the work and obtained some machinery from Fred Caron and John Oliver, hereafter called "Caron," on a lease purchase agreement. Caron began an action against Andrews and their surety, Farm Service, and also against Grimes and Picchi. They sought compensation for the use of their machinery, asking also for the declaration and foreclosure of a materialman's lien upon the real property. Both Grimes and Picchi cross-complained against Andrews and Farm Service for damages alleged to have arisen out of the breach of the leveling contract. Judgment was rendered, granting Caron a sum in compensation for the use of their machinery and denying them a lien. Judgment was also given in favor of Grimes and Picchi against Farm Service. Motions for new trial as to all judgments were made by the parties against whom the judgments were rendered, and were denied as to the judgments in favor of Grimes and Picchi, but granted as to the judgment in favor of Caron. A further trial was held as to Caron and judgment was rendered in Caron's favor, which judgment is the subject of a separate appeal. It was stipulated during the proceedings that Andrews had been adjudicated bankrupt and so no judgment was rendered against them. Farm Service appeals from the judgments against it and Grimes also appeals, contending that a larger award should have been made. The Grimes appeal is on the judgment roll alone.

The court made findings as follows: That Andrews entered upon the lands and partially performed the work called for in the leveling contract; that on October 25, 1950, Andrews

defaulted, abandoned the work, left the premises and never returned for the purpose of completing the work; that after the abandonment of the work by Andrews and on November 15, 1950, Farm Service, in performance of the terms of its surety agreement ''did enter upon the performance of the contract of July 14, 1950 [the leveling contract]'' with the consent and permission of Grimes and Picchi and ''did then undertake the performance and completion of said contract of Andrew Brothers as guarantors''; that on February 24, 1951, Farm Service ceased work and thereupon was served with a written demand by Grimes and Picchi for the completion of the work of leveling; that Farm Service thereupon advised Grimes and Picchi that it would not complete the contract; that thereafter Farm Service quit the premises and never returned; that thereafter Grimes and Picchi entered into agreements with others to complete the land leveling; that the actual and reasonable cost of completion to Grimes was the sum of $29,736.38; that Grimes had paid for the work done by Andrews and Farm Service a total of $19,346, making the whole cost of leveling the Grimes land the sum of $49,082.38, as opposed to $29,162, his share of the contract price, leaving Grimes damaged in the sum of $19,920.38 by failure of Andrews and Farm Service to complete the contract. Similar findings with respect to Picchi fixed the damages of Picchi in the amount of $4,960. In addition to the foregoing damages, special damages were awarded both Grimes and Picchi. Grimes was awarded further damages in the sum of $6,060 for loss of use of land and $2,500 for attorney's fees, as provided for in the leveling contract in event of breach. Picchi was given special damages in the sum of $1,252.50 because of leveling work improperly done by Andrews which had to be corrected, and the further sum of $1,946 for loss of crops for failure to properly level. Picchi was also awarded attorney's fees in the sum of $1,500. The damages awarded to Grimes thus totaled $28,480.38 and those awarded to Picchi totaled $9,658.50. The court limited the awards to the penalty of the bond, pro rating the bond penalty of $26,000 between Grimes and Picchi in proportion to their total awards, with the result that Grimes received a judgment for $19,416.10 and Picchi received judgment for $6,583.90.

There were heavy rains in the fall of 1950. On November 20th, following an unusually heavy storm, there were several breaks in the master levees surrounding the land and the property was partially flooded. On December 5th a second

flooding occurred due to further breaks in the levees and this flood almost completely inundated the property. Later in December both Grimes and Picchi requested the United States Army Corps of Engineers for aid in the repair of the levees. The request was granted and the levees were repaired. Permission was given the Army Engineers to use dirt for the repair of the master levees taken from a cross levee within the Grimes-Picchi property lines and some earth was also taken from the surface of the fields. The consent of neither Andrews nor Farm Service was obtained for this use of earth for levee repair and this situation forms the main ground of attack on the judgment by appellant Farm Service. Farm Service had affirmatively pleaded in its answer to the cross-complaint of Grimes and Picchi that the lands had been flooded by waters escaping from the streams; that the lands had been under water for more than three months and that by reason of the flooding the contour thereof had been materially changed from that existing at the time the leveling agreement was made; that such conditions were not contemplated by any of the parties to the contract and had been brought about by happenings beyond their control; that the performance of the land leveling agreement had thus been made impossible. Farm Service had further pleaded that after the flooding of the lands and without its knowledge or consent Grimes and Picchi had materially altered the subject matter of the contract by wilfully removing great portions of the surface of the land for the purpose of building levees and dikes to prevent further flooding; that the removal of such large quantities of dirt constituted a material alteration of the obligation of Andrews and that by reason thereof Farm Service had been released from its obligations as surety. As to these affirmative defenses the court found that although the lands had been flooded it was not true that by reason thereof Andrews and Farm Service were unable to complete the work of leveling and that it was not true that the flooding made such completion impossible; that the flooding had not caused material changes in the contours of the land and that the flooding did not result in any change or destruction of the subject matter of the leveling contract; that it was not true that the flooding could not have been or was not anticipated or contemplated by the parties to the contract and that the agreement had been made in anticipation and contemplation that such flooding might occur; that Grimes and Picchi had not altered materially the subject matter of the

leveling contract by permitting the Army Engineers to move dirt from the land and from the cross levee and that it was untrue that the removal of such dirt constituted such material alteration. The court concluded that the flooding and the dirt removal had not released Farm Service from the obligations of its surety contract.

The principal contention of appellant Farm Service is that these findings against its affirmative defenses are not sustained by the evidence. This contention cannot be sustained.

Treating first the claim that the contract became impossible of performance by reason of the levee breaks and the consequent flooding of the lands to be leveled, it is to be noted that the contract itself contains no provisions excusing performance even within the time limited by the contract in the event that the levee should break and the lands should be flooded. This is significant in view of the facts, which are in the domain of common knowledge, that lands lying behind protecting levees of the San Joaquin River and its tributaries are subject to inundation by flood waters which overtop or break through the levees. The history of lands in the Sacramento and San Joaquin Valleys, situated as were the lands which were the subject of the leveling contract, is that of partial rather than complete protection by levees and when the parties contracted they knew that these lands might be flooded prior to the time when Andrews agreed to complete the leveling, that is, prior to December 1, 1950. Flood waters at that time of the year may be unusual, but are certainly not unknown, and it would have been a simple matter to have provided for extensions of time if such floods should occur. No protecting provisions were inserted in the contract and so it must be said that Andrews and their surety accepted the hazard that such floods might occur. The record is barren of any request by Andrews or Farm Service for extensions of time to complete the work because the levees had broken, although the testimony produced by Grimes was to the effect that extensions would have been favorably considered if the same had been requested.

"... [W]here a party has agreed, without qualification, to perform an act which is not in its nature impossible of performance, he is not excused by the difficulty of performance, or by the fact that he himself becomes unable to perform. The impossibility which will excuse the performance of a contract must consist in the nature of the thing to be done and not in the inability of the obligor to do it. If

the thing to be done is not naturally or necessarily impossible under all circumstances, a positive contract to do it is binding, though the performance is rendered impracticable, or even impossible, by some unforeseen cause over which the promisor has no control but against which he might have provided in his contract. The rule applies as well, of course, to a foreseen possible cause over which the party might exercise control.'' (12 . Cal.Jur.2d ''Contracts'' p. 461, § 238.)

Andrews undertook unconditionally to level the land by the first of December, 1950, unless the owners should agree in writing to an extension of time. Consent of the owners was the only condition of the contract excusing performance within the stipulated time and no request for an extension was made. Under such circumstances appellant cannot excuse failure of performance by reason of the flooding of the land. In addition to the foregoing there was evidence that Andrews had slowed down the work and moved equipment away from the job before the first flooding occurred and that the first flooding was temporary in its effect and did not necessarily stop the progress of all work. The court found that Andrews abandoned the work on October 25th, whereas the first flood occurred on November 20th following. By that time, according to the court's findings, Farm Service had undertaken the completion of it. This new undertaking by the surety likewise was found by the court to have occurred without the surety having exacted any stipulation that it would be relieved if, due to the lateness of the season, the contract could not be completed by reason of unseasonal rainfall, or flooding.

Turning now to the contention that Grimes and Picchi, by permitting the Army Engineers to repair the levees and for that purpose to use the cross levee and soil from other portions of the fields, had materially altered the work to be done without the consent of the surety, we find the following to have been the situation. Most of the soil borrowed by the engineers for levee repair was taken from a cross levee of considerable size which lay within the surrounding levees and evidently constituted a secondary protection. This levee was approximately 40 feet wide at the base, 20 feet wide at the top and 8 feet high. It contained more than . 31,000 cubic yards of earth. A great deal of this material was used by the Army Engineers and in fact the cross levee furnished the great mass of material taken by them to repair the levees. Farm Service contends that since the levee was in place when Andrews contracted and was available for use in leveling the

lands by furnishing fill material for low portions that its removal for levee repair materially altered the work to be done by Andrews. But it was not a levee which the landowners were required to make available to Andrews for such uses. The contract itself specified that "levees contained within master levees are to be removed except as specified by owners." The trial court properly construed the contract, therefore, as giving to the owners, Grimes and Picchi, the right to withhold the cross levees, including the one in question, from use by Andrews. When, therefore, Grimes and Picchi permitted the Army Engineers to use portions of the cross levee they did not deny to Andrews any right accorded by the contract. There was evidence that, in addition to borrowing fill dirt from the levee, the Army Engineers were permitted to make additional borrowings from the surface of the fields in several places. But there was also evidence that the borrowing actually made did not result in any necessary added expense to the work of leveling. On the whole record, therefore, there is support for the findings of the court that the subject matter of the contract was not materially altered, nor the burdens of Andrews or Farm Service increased, by anything done by Grimes or Picchi outside of their rights under the contract and without the consent of Andrews or Farm Service.

In testing the sufficiency of the record to support the findings of the trial court, it must be borne in mind that the findings had to do with affirmative defenses interposed by appellant Farm Service. The burden of proving these affirmative allegations was upon appellant and the findings of the court in respect thereto must be sustained on appeal unless the evidence adduced at the trial was such as to compel the court as a matter of law to find these allegations to be true. (*Roesch* v. *De Mota,* 24 Cal.2d 563, 570-571 [150 P.2d 422].) Said the court:

"In substance the trial court found and concluded that the plaintiffs and those equally charged with them in sustaining the burden had not proved payment by a preponderance of evidence. The problem here is not whether the appellants on the issue of payment failed to prove their case by a preponderance of the evidence. That was a question for the trial court and it was resolved against them. The question for this court to determine is whether the evidence compelled the trial court to find in their favor on that issue."

We turn now to a consideration of the appeal of Grimes presented on the judgment roll alone, wherein Grimes contends

that as a matter of law the findings of fact made by the trial court as to the actions of Farm Service after Andrews breached the leveling contract required the trial court to conclude, as a matter of law, that the damages awarded Grimes and Picchi ought to have been allowed in full in the judgment and could not be properly limited to the penalty of the bond. This contention must be sustained. In examining it, we must, of course, take the findings of the trial court as being sufficiently supported by the evidence. The pertinent findings read as follows:

"That after the abandonment of work under said contract by said Andrew Brothers on October 25, 1950, and on November 15, 1950, defendant Farm Service Company, a corporation, in the performance of the terms of said agreement set forth in paragraph XX hereof [the contract of suretyship] did enter upon the performance of the contract of July 14, 1950, between said Frediano E. Picchi and H. H. Grimes as Owners and said Andrew Brothers as Contractors, with the consent and permission of cross-complainants Picchi and Grimes and did then undertake the performance and completion of said contract of Andrews Brothers as guarantors and under and pursuant to the provisions of said agreements mentioned and set forth in paragraphs XIX and XX hereof; that thereafter and on or about February 24, 1951, defendant Farm Service Company, a corporation, ceased work under and pursuant to said contracts and agreements aforementioned; that thereafter and on February 24, 1951, a written demand was made by cross-complainants . . . upon said Andrew Brothers and said cross-defendant Farm Service Company, a corporation, for the completion of the work agreed to be done and undertaken . . . and . . . Farm Service Company, a corporation, . . . advised said cross-complainants and each of them in writing that they would not complete said contracts and agreements and left the premises and did not return for the purpose of fulfilling the terms of said contracts and agreements."

█ Upon breach by the principal, the surety is, unless otherwise specifically provided in the contract, free to rest upon the contract of suretyship and if it does it cannot be held beyond the limit of its bond and it may invoke any defense open to it as surety. █ If, however, upon breach by the principal it elects to and is permitted under the contract or by permission obtained after breach to step into the place of its principal and perform that principal's contract,

it then makes itself subject to the principal's liabilities. This latter was the course of conduct which the court found Farm Service elected to pursue. This subject was discussed by the Supreme Court of Louisiana in *Klein* v. *J. D. & J. M. Collins*, 159 La. 704 [106 So. 120, 122], the court saying:

"Considering, first, the contentions of the surety company it may be said that, had that company, for instance, left it to the owner to complete the work upon the default of the contractors, unquestionably the company could not be held liable for more than the amount for which it had bound itself as surety, except that such additional amounts, imposed by law, such as costs of court and statutory penalties. . . . However, if the company, upon the default of the contractors, undertook to complete the work, a different case is then presented. In that event, the company, by such new undertaking, put itself in the place of the contractors from the moment of the new undertaking, and became liable for the costs of completing the building, without reference to the amount for which it had signed as surety. In other words, in that event, from that moment on, the company occupied the position of contractor and became liable for the costs of completion accordingly, and also for damages, as fixed in the contract, which it then undertook to execute, for the delay in completing and delivering the building." (See, also, *Ausplund* v. *Aetna Indem. Co.*, 47 Ore. 10 [81 P. 577, 580, 82 P. 12]; *Mazzera* v. *Ramsey*, 72 Cal.App. 601, 609 [238 P. 101]; *Griffith* v. *Rundle*, 23 Wash. 453 [63 P. 199, 200, 55 L.R.A. 381]; *U. S. Fidelity & Guar. Co.* v. *Zidell-Steinberg Co.*, 151 Ore. 538 [50 P.2d 584, 588, 51 P.2d 687]; *State* v. *Cornwall*, 102 Ore. 220 [201 P. 1072]; *Beers* v. *Wolf*, 116 Mo. 179 [22 S.W. 620, 621].)

In the case last cited the court said:

"One who is in reality a surety may contract as a principal. He may waive the rights which the law throws around a surety, for such a waiver has nothing in it offensive to the law; and the surety does waive such rights when he in terms contracts and agrees to be bound as principal."

Under the findings of fact made by the trial court, hereinbefore recited, Farm Service, by entering upon the work, assuming the contract of the principal and undertaking to complete it after the principal's breach, rendered itself liable for damages proximately flowing from its own succeeding breach, and this without limitation as to amount. It stepped into its principal's shoes and, as the court found, undertook to complete its principal's contract without in any way

seeking to protect itself by exacting extensions of time or other conditions which would or might make its undertaking less burdensome. Having done this and having consumed several months of time, it, in turn, breached its obligations and abandoned the work, leaving it to Grimes and Picchi to extricate themselves as best they could from the difficulties thus cast upon them. Thereafter Farm Service could not shelter itself behind the limitation of its liability expressed in its bond as it might have done had it rested upon its surety contract. The contention it now makes is that notwithstanding such conduct it did have such right. That contention cannot be sustained.

For the foregoing reasons the judgment in favor of Picchi is affirmed. The judgment in favor of Grimes is affirmed so far as is concerned the amount awarded by the trial court to Grimes; and responsive to the crossappeal of Grimes the trial court is directed to amend its judgment by including therein that portion of the damages Grimes was found to have suffered not included in the present judgment in Grimes' favor.

Peek, J., and Schottky, J., concurred.

The petition of cross-defendant and appellant Farm Service Co. for a rehearing was denied June 22, 1955, and its petition for a hearing by the Supreme Court was denied July 27, 1955.