[Civ. No. 42406. Second Dist., Div. Three. Apr. 24, 1974.]

GENERAL INSURANCE COMPANY OF AMERICA,
Plaintiff and Appellant, v.
ST. PAUL FIRE AND MARINE INSURANCE COMPANY,
Defendant and Respondent.

**Counsel**

Booth, Mitchel, Strange & Smith and George C. Mitchel for Plaintiff and Appellant.

Dillavou & Webb and C. C. Dillavou for Defendant and Respondent.

**Opinion**

**COBEY, J.**—Plaintiff, General Insurance Company of America, surety of the prime contractor involved, appeals from a judgment in favor of defendant, St. Paul Fire & Marine Insurance Company, surety for a subcontractor, which defaulted in its subcontract work under the prime contract. The action is essentially one for damages plaintiff suffered in excess costs and liquidated damages occasioned by the default.

The judgment which was granted on defendant's motion therefor, pur-

suant to Code of Civil Procedure section 631.8, apparently rests on two grounds: (1) plaintiff's failure to comply substantially or otherwise with the Contractors License Law (Bus. & Prof. Code, §§ 7000-7161);[1] (2) the default of the prime contractor discharged the subcontractor's obligations to it under the subcontract.

We do not reach the second ground of the trial court's decision as we affirm the judgment on the first ground alone.

## FACTS

On February 19, 1963, Diverco Constructors, a limited partnership in which the sole general partner was Diverco Constructors, Inc.,[2] entered into a written contract with Shoreham Towers, a general partnership, for the construction in Los Angeles of a high-rise apartment building bearing that name. On the same day plaintiff executed its contract performance bond with the limited partnership as principal and Shoreham Towers and its bank as obligees. About three weeks later the corporation entered into a written subcontract with V. C. Walters Electric, Inc. to perform the electrical work on the Shoreham Towers project called for by the just-mentioned prime contract. About a week thereafter defendant executed a subcontract performance bond with this subcontractor as principal and the corporation as obligee.

---

[1]More precisely, defendant's motion for judgment was granted on the basis of Business and Professions Code section 7031, which, in relevant part, reads: "No person . . . acting in the capacity of a contractor, may bring or maintain any action in any court of this state for the collection of *compensation* for the performance of any act or contract for which a license is required by this chapter without alleging and proving that he was a duly licensed contractor at all times *during the performance* of such act or contract, . . ." (Italics added.)

It can be argued that under *Davis Co.* v. *Superior Court*, 1 Cal.App.3d 156, 159 [81 Cal.Rptr. 453], section 7031 does not bar plaintiff's action for *damages* occasioned by the default of defendant's principal on its subcontract. In our view, *Davis* adopts too narrow a meaning of the term "compensation" as used in section 7031. Properly construed, the term embraces damages suffered by a contractor lacking the requisite license under the law for breach of a contractual obligation where either (1) the making of the contract or (2) the performance during which the breach occurs comes within the licensing requirement. (*Currie* v. *Stolowitz*, 169 Cal.App.2d 810, 813 [338 P.2d 208]; *Proffitt & Durnell Plumbing, Inc.* v. *David H. Baer Co.*, 247 Cal.App.2d 518, 520 [55 Cal.Rptr. 764].) The contract breached in *Davis* was not such a contract. (See *Davis, supra*, p. 160.)

Section 7028 of the law makes it unlawful for any person to act in the capacity of a contractor in California without having a license therefor, unless that person is particularly exempted from the provisions of the law.

All section references hereafter are to the Business and Professions Code.

[2]The limited partnership had no employees. Its affairs were conducted by the corporation.

On June 14, 1963, plaintiff learned that its principal, the limited partnership, was in financial difficulties. A week later the partnership informed plaintiff, as its surety on several contracts, including the Shoreham Towers' contract, that it would not be able to complete those contracts without financial assistance from or arranged by plaintiff. A few days thereafter, plaintiff, as surety, notified Shoreham Towers, the owner, in writing, that the owner should make no further payments to the limited partnership without plaintiff's prior written consent and approval. Plaintiff also assured the owner at this time that it was going to see that the project was completed.

Plaintiff then apparently took a written assignment of all monies due and to be due the limited partnership from the project and arranged that the owner thereafter make all payments for project work to plaintiff. Plaintiff thereafter supplied to the corporation the funds needed to pay all of its past due bills arising from its continued work on the project and thereafter supplied funds as needed to meet all bills arising from the project.

On October 16, 1963, after some two months of negotiation, plaintiff entered into a written agreement with the limited partnership and others under which the limited partnership designated one Lewis E. Douglas (or such other person as plaintiff might name) as the manager of the Shoreham Towers project and irrevocably abandoned to Douglas the right to act with respect to the project "except with the express written prior permission of . . . [plaintiff]."[3] Pursuant to this agreement Douglas, who

---

[3] The relevant portions of this agreement read:

"4. CONTRACTOR [limited partnership] shall diligently complete the SHOREHAM PROJECT so as to minimize loss on such project, which completion shall be performed in accordance with the following express provisions:

"A. CONTRACTOR shall designate Lewis E. Douglas, or such other person as GENERAL [plaintiff] shall direct, as CONTRACTOR's sole authorized agent for management of the SHOREHAM PROJECT, called Project Manager, with full authority in behalf of CONTRACTOR to deal with all matters necessary to the completion of the SHOREHAM PROJECT, including the negotiation of change orders, extras and contract modifications with the owner, change orders, extra work and modifications to subcontracts now in existence, extensions of time with respect to both the owner and subcontractors, the subcontracting of work not already subcontracted, and the re-letting of subcontracts which are defaulted by an existing subcontractor, the purchasing of materials, equipment and supplies necessary to the completion of the SHOREHAM TOWERS PROJECT, the submission of progress billings, billings for extras and final payments, waivers and releases of liens, the employment and discharge of any person employed by CONTRACTOR with respect to the SHOREHAM PROJECT, and all other things which the managing officer of CONTRACTOR might do with respect to the SHOREHAM PROJECT.

"B. CONTRACTOR shall irrevocably abandon all right to act with respect to the

had been picked for the position by plaintiff, at once took over the management of the project. Plaintiff continued to receive all of the owner's payments due on the project and to supply all of the funds needed to pay the bills of the corporation arising from the project through a special bank account set up for that purpose and controlled exclusively by plaintiff. Following the entry of the agreement, the day-to-day operations of the construction of Shoreham Towers was under Douglas' control alone. He reported only to plaintiff and could have been discharged by plaintiff at any time.

On December 17, 1963, the aforementioned V. C. Walters Electric, Inc. (then known as Mt. Vernon Electric, Inc.) notified the corporation and Douglas that it could no longer continue its work under its subcontract. After notification to defendant of this default, the corporation, through Douglas, entered into a new subcontract with S & K Electric Co. to complete Mt. Vernon's work. S & K Electric Co. did this at an increased cost.

The Shoreham Towers project was completed sometime after June 1964. Throughout the year or so of plaintiff's active association with the project, plaintiff was never licensed under the Contractors License Law.

## DISCUSSION

■ In an unpublished decision filed on December 18, 1969 (2d Civ. No. 33670), this court reversed a summary judgment for defendant in this case on the ground that certain triable issues of fact then existed. We there held though that "a surety company acting in the capacity of a building contractor is subject to the provisions of the Contractors License

---

SHOREHAM PROJECT in any of the capacities authorized to Lewis E. Douglas, as Project Manager, and in any other way, except with the express written prior permission of GENERAL [plaintiff].

". . . . . . . . . . . . . . . .

"D. Project Manager's authority with respect to the project is subject to the following limitations.

"1. No purchase order or subcontract may be let by Project Manager for an amount in excess of the budgeted amount for such item without the prior consent of GENERAL.

"2. No change involving an amount in excess of $5,000.00 can be negotiated with the owner or with any subcontractor without the consent of GENERAL.

"3. No change order may be negotiated with any subcontractor for which a corresponding change order in excess of the amount of the subcontractor's change order has been approved by the owner, without the prior consent of GENERAL."

Law" in view of the stringent public policy involved[4] and because there is no express exemption of surety companies in the law.

Plaintiff argues that since its occupation of surety insurer statutorily includes the guaranteeing of the performance of contracts (Ins. Code, § 105, subd. (1)) and since this was what it was doing in this case, it should not be held subject to the Contractors License Law by reason of its conduct here. We concede that plaintiff acted in this case within the scope of its statutory function as a surety. But it was *the manner* in which it chose to discharge this function that brought it, in our view, within the Contractors License Law. (Cf. *Caron* v. *Andrew,* 133 Cal.App.2d 402, 410-412 [284 P.2d 544].)

The trial court found "that at all times after June 15, 1963, Plaintiff . . . acted as a general building contractor with respect to the work of construction known as Shoreham Towers." This finding is binding upon us if supported by substantial evidence. We hold on the basis of the facts already set forth by us that it is—subject only to a modification in time that does not affect its validity otherwise.

We deem it unnecessary to decide whether plaintiff acted as a contractor within the meaning of section 7026 of the law during the period between June 21, 1963, and October 16, 1963. This was the period during which plaintiff confined its activities to controlling the flow of funds to and from the Shoreham Towers project. We take this position because it seems clear to us that plaintiff did so act from October 16, 1963 on when, in addition to continuing its financial control of the funds of the project, it placed its man, Douglas, in complete charge of the project to the exclusion of both the limited partnership and the corporation. It was during this period that defendant's principal defaulted in its subcontract.

"The law respects form less than substance." (Civ. Code, § 3528.) Although the agreement of October 16 characterized Douglas as the agent of the limited partnership for the management of the project, in the agreement itself, as previously stated, the limited partnership expressly irrevocably abandoned to Douglas all right to act with respect to the project

---

[4]"Section 7031 represents a legislative determination that the importance of deterring unlicensed persons from engaging in the contracting business outweighs any harshness between the parties, and that such deterrence can best be realized by denying violators the right to maintain any action for compensation in the courts of the state. . . ." (*Lewis & Queen* v. *N. M. Ball Sons,* 48 Cal.2d 141, 151 [308 P.2d 713].)

except with plaintiff's written prior permission. In other words, under the express terms of the agreement the project was within the complete and exclusive control of plaintiff—acting in large part through Douglas.[5]

The judgment is affirmed.

Allport, Acting P. J., and Potter, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 19, 1974.

---

[5]The fact that at all times during his employment on the project Douglas was individually licensed under the law and became the responsible managing employee on the corporation's license—upon its reissuance on December 19, 1963—is of no avail to plaintiff. The law required that plaintiff in its voluntarily assumed capacity as "contractor" be itself licensed. (See *Lewis & Queen* v. *N. M. Ball Sons, supra,* 48 Cal.2d 141, 148-149.)

The limited partnership held a contractor's license from July 27, 1961, to June 30, 1963. The corporation held one from February 18, 1963, to July 30, 1963, and from December 19, 1963, to October 21, 1964. It did not have one between July 1, 1963, and December 19, 1963.