CHIN, J.,
Dissenting. — I agree with the majority that, under Welfare and Institutions Code section 709,[1] a minor is presumed competent and bears the burden of proving otherwise by a preponderance of the evidence. However, under the deferential standard of appellate review that applies in light of this conclusion, I would affirm the juvenile court’s finding that R.V. was competent. I therefore dissent.
1. The Standard of Review.
The standard of appellate review that applies here follows from (1) the majority’s conclusion, with which I agree, that R.V. bore the burden of proving incompetency by a preponderance of the evidence, and (2) the juvenile court’s finding that R.V. failed to sustain that burden.
In evaluating the sufficiency of the evidence on appeal, appellate courts generally apply the familiar substantial evidence test. Under that test, an appellate court must view the evidence in the light most favorable to the court’s judgment, giving it the benefit of every reasonable inference and resolving all conflicts in its favor. (Bickel v. City of Piedmont (1997) 16 Cal.4th 1040, 1053 [68 Cal.Rptr.2d 758, 946 P.2d 427].) The appellate court must “presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact’s findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] ‘A reviewing court neither reweighs evidence nor reevaluates a witness’s credibility.’ [Citation.]” (People v. Albillar (2010) 51 Cal.4th 47, 60 [119 Cal.Rptr.3d 415, 244 P.3d 1062].)
However, as our courts of appeal have explained, where, as here, the trier of fact has found that the party with the burden of proof did not carry that *218 burden, “it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact’s unassailable conclusion that the party with the burden did not prove one or more elements of the case [citations]. [¶] Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant’s evidence was (1) ‘uncontradicted and unimpeached’ and (2) ‘of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.’ [Citation.]” (In re I.W. (2009) 180 Cal.App.4th 1517, 1528 [103 Cal.Rptr.3d 538]; see Meister v. Mensinger (2014) 230 Cal.App.4th 381, 395 [178 Cal.Rptr.3d 604]; Dreyer’s Grand Ice Cream, Inc. v. County of Kern (2013) 218 Cal.App.4th 828, 838 [159 Cal.Rptr.3d 832] [same]; Valero v. Board of Retirement of Tulare County Employees’ Assn. (2012) 205 Cal.App.4th 960, 966 [141 Cal.Rptr.3d 103]; Shaw v. County of Santa Cruz (2008) 170 Cal.App.4th 229, 279 [88 Cal.Rptr.3d 186] [same]; Caron v. Andrew (1955) 133 Cal.App.2d 402, 409 [284 P.2d 544].)
Notably, these appellate decisions relied on our decision in Roesch v. De Mota (1944) 24 Cal.2d 563 [150 P.2d 422]. There, after explaining that the trial court had found that the plaintiffs had failed to sustain their burden of proving a certain fact by a preponderance of the evidence, we stated; “The problem here is not whether the appellants on the issue . . . failed to prove their case by a preponderance of the evidence. That was a question for the trial court and it was resolved against them. The question for this court to determine is whether the evidence compelled the trial court to find in their favor on that issue. These appellants contend that the testimony of [their witness] was uncontroverted and that it required a finding in their favor. It may be assumed that his testimony was uncontradicted and unimpeached, but it would not necessarily follow that it was of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding in favor . . .” of the appellants. (Id. at pp. 570-571, italics added.)
The same rules apply where the evidence consists of expert opinion. It is well established that a trier of fact is “not automatically required to render a verdict [that] conforms to . . . expert opinion,” even if “unanimous.” (People v. Drew (1978) 22 Cal.3d 333, 350 [149 Cal.Rptr. 275, 583 P.2d 1318]; see People v. Samuel (1981) 29 Cal.3d 489, 498 [174 Cal.Rptr. 684, 629 P.2d 485] [trier of fact “is not required to accept at face value a unanimity of expert opinion”].) “To hold otherwise would be in effect to substitute a trial by ‘experts’ for a trial by jury . . . .” (People v. Wolff (1964) 61 Cal.2d 795, 811 *219 [40 Cal.Rptr. 271, 394 P.2d 959].) As we have explained, “[t]he value of an expert’s opinion depends upon the quality of the material on which the opinion is based and the reasoning used to arrive at the conclusion.” (People v. Marshall (1997) 15 Cal.4th 1, 31-32 [61 Cal.Rptr.2d 84, 931 P.2d 262].) In other words, “ ‘[e]xpert evidence is really an argument of an expert to the court, and is valuable only in regard to the proof of the facts and the validity of the reasons advanced for the conclusions.’ ” (People v. Bassett (1968) 69 Cal.2d 122, 141 [70 Cal.Rptr. 193, 443 P.2d 777].) Thus, as a general rule, the trier of fact remains free to reject even uncontradicted expert testimony after considering the expert’s opinion, reasons, qualifications, and credibility, so long as it does not act arbitrarily. (People v. McDonald (1984) 37 Cal.3d 351, 371 [208 Cal.Rptr. 236, 690 P.2d 709]; People v. Johnson (1992) 3 Cal.4th 1183, 1231-1232 [14 Cal.Rptr.2d 702, 842 P.2d 1]; Foreman & Clark Corp. v. Fallon (1971) 3 Cal.3d 875, 890 [92 Cal.Rptr. 162, 479 P.2d 362].) The trier of fact’s decision in this regard is binding on an appellate court unless the trier of fact could not, in light of the record, reasonably reject the expert’s testimony. (Samuel, supra, at p. 506; Drew, supra, at pp. 350-351.) Under the preceding authorities, the questions here are whether the juvenile court could not have reasonably rejected Dr. Kojian’s opinion and whether the weight and character of the evidence compelled the court to find that R.V. had sustained his burden to show incompetency.
2. The Evidence Does Not Compel a Finding of Incompetence.
According to the majority, reversal is necessary because the juvenile court could not reasonably have rejected the opinion of forensic psychologist Haig J. Kojian that R.V. was not competent to proceed. For reasons that follow, I disagree.
Under the two prongs of section 709, subdivision (a), it was R.V.’s burden to prove by a preponderance of evidence that he lacked either “sufficient present ability to consult with counsel and assist in preparing his . . . defense with a reasonable degree of rational understanding,” or “a rational as well as factual understanding, of the nature of the charges or proceedings against him.” Regarding the latter prong, in the “Opinion” section of his written report, Dr. Kojian expressed not a firm conclusion, but uncertainty, stating that he “question[ed¡ whether [R.V.] fully knows or understands what is occurring.” (Italics added.) He based his uncertainty on the various statements R.V. had made about the reason for his detention. In his report, after setting forth those statements, Dr. Kojian stated: “It appeared to me that [R.V.] was confused and didn’t know what was going on.” However, the juvenile court *220 disagreed with Dr. Kojian’s reasoning, explaining: “Given the statements that the minor had said to Dr. Kojian and Dr. Kojian interpreted them as confusion, but knowing that the minor had been released on [the home supervision program], and also knowing what the minor had allegedly done, and [that each] of his responses were appropriate, such as messing up my house and not going to school, because he had refused to go to school, which appeared to have been allegedly the — at least was alleged to have been the genesis of what ended up in the charged offenses.” Viewing the evidence in the light most favorable to the court’s decision, and giving that decision the benefit of every reasonable inference and resolving all conflicts in its favor, I cannot find that the court unreasonably rejected Dr. Kojian’s interpretation.
Moreover, Dr. Kojian’s testimony at the competency hearing regarding this prong was at least as equivocal as the statements in his report, if not more so. When directly asked whether R.V. “lack[ed] a rational [as] well as factual understanding of the nature of the charges and proceedings against him,” Dr. Kojian did not reply with a clear or unqualified “yes.” Instead, he replied, “I think it is limited, yes.” Dr. Kojian’s testimony that R.V. had a “limited” understanding did not compel the juvenile court to find that R.V. had proved by a preponderance of the evidence that he “lack[ed]” the requisite understanding, which is the standard under section 709, subdivision (a).
Indeed, parts of Dr. Kojian’s report affirmatively supported the conclusion that R.V. possessed the requisite understanding. The report observed that R.V. “knew, in general, the meanings of guilty or not guilty,” that the former “means he is responsible” and the latter means he “could be released home,” that “the court makes a decision,” and that “misdemeanors are less serious than felonies.” The juvenile court expressly mentioned the last of these observations in explaining why it did not accept Dr. Kojian’s opinion. Moreover, the record also shows that when advised of his rights upon his arrest, R.V. invoked his right to silence. Viewing the evidence in the light most favorable to the court’s decision, giving that decision the benefit of every reasonable inference and resolving all conflicts in its favor, the weight and character of Dr. Kojian’s opinion was not such that the juvenile court acted unreasonably in finding that R.V. failed to sustain his burden of proof on the second prong of section 709, subdivision (a).
The majority acknowledges that R.V. invoked his right to silence after being advised of his rights, that he was aware generally that a misdemeanor was less serious than a felony, that a judge makes decisions, and that being guilty means he is “ ‘responsible.’ ” (Maj. opn., ante, at p. 213.) The majority *221 also “[a]dmit[s]” that “some of’ R.V.’s statements about the reasons for his detention were “explainable,” “understandable,” and, “as the [juvenile] court pointed out,” an “arguably . . . accurate reflection of some of the factual underpinnings of the charges against him.” (Ibid.) The majority nevertheless declares that R.V.’s statements failed to “provide a reasonable basis” for rejecting Dr. Kojian’s opinion because they “were limited and incomplete.” (Id. at pp. 212-213.) According to the majority, “most of’ R.V.’s statements “reflected ignorance of, or confusion regarding, many of the significant features of a juvenile adjudication,” including the functions of defense counsel and the prosecutor, the differences between a plea bargain and a trial, and the types of decisions that a juvenile court judge makes. (Id. at p. 213.) The majority also asserts that, according to Dr. Kojian’s report and testimony, R.V. “seemed to misunderstand what was meant by a criminal charge” and “exhibited no awareness of the most important facts underlying the charges.” (Ibid.) “On this record,” the majority declares, R.V.’s statements “suggesting” that he “understood some features of a juvenile proceeding generally” and was not confused about what as happening did not provide a reasonable basis for questioning Dr. Kojian’s opinion. (Ibid.)
For several reasons, I disagree with the majority’s analysis. First, as explained above, insofar as the record shows that Dr. Kojian based his opinion regarding R.V.’s confusion on statements that, as the majority “[a]dmit[s],” were “explainable,” “understandable,” and an “arguably . . . accurate reflection of some of the factual underpinnings of the charges against” R.V. (maj. opn., ante, at p. 213), the juvenile court could reasonably question Dr. Kojian’s reasoning. Second, for reasons explained above, the juvenile court could reasonably conclude that Dr. Kojian’s opinion regarding R.V.’s confusion was far more equivocal and uncertain than the majority suggests. As noted earlier, in the “Opinion” section of his report, Dr. Kojian stated that he “questioned] whether [R.V.] fully knows or understands what is occurring.” At trial, Dr. Kojian testified, not that R.V. lacked the requisite understanding, but that he had a “limited” understanding of the nature of the charges and proceedings against him. Third, although, as the majority notes, R.V. told Dr. Kojian he did not know what a judge makes decisions about or what “the duty and function of the DA” are, the majority fails to note that R.V. also told Dr. Kojian that he had “never thought” about the first question and “had never had the time to think about” the second. Given this explanation, the juvenile court could have reasonably questioned whether R.V.’s asserted lack of knowledge about certain legal matters, notwithstanding his understanding of other legal matters, indicated confusion and incompetence. Fourth, and finally, the majority’s explanation for concluding that the statements in the record showing R.V.’s understanding of the legal process are too *222 “limited and incomplete” to sustain the juvenile court’s decision (id. at pp. 212-213) is inconsistent with the applicable standard of review, which requires us to view the evidence in the light most favorable to the juvenile court’s judgment, to give that judgment the benefit of every reasonable inference, and to resolve all conflicts in its favor. Applying this standard, and in light of the preceding discussion, I do not agree that the juvenile court, which itself had the opportunity to observe R.V., acted unreasonably in rejecting Dr. Kojian’s opinion.
Regarding the first prong of section 709, subdivision (a), Dr. Kojian stated in his written report: “I. . . believe that in his current condition [R.V.] doesn’t have the capacity to meaningfully or rationally cooperate with counsel in the preparation of a defense, or to assist counsel in a meaningful or rational manner.” At the hearing, the juvenile court explained that it did “not accept” Dr. Kojian’s opinion on this issue “partly because the doctor was not able to fully determine whether there was malingering and was unable to complete the Rey . . . test” for malingering. Significantly, Dr. Kojian’s report itself provided a basis for the juvenile court’s reliance on this consideration in rejecting Dr. Kojian’s opinion; the report noted five separate times that R.V. “refused to take any tests,” and characterized this refusal as “[u]nfortnate[]” four of those times. As specifically relevant to the malingering issue, Dr. Kojian stated in his report: “I tried a few times to get him to comply [with my request for testing] but he refused noting T just don’t feel I have to do this.’ I, even, asked him if he wouldn’t mind taking just one, little test (I was trying to give him the REY 15-item to rule out malingering) but he refused.” After responding to a few “basic items,” R.V. “refused to answer any other questions and said ‘I’m not going to say anything else. I am just trying to get help.’ ” If Dr. Kojian believed that R.V.’s refusal to take any tests was significant — and it is clear from the statements in his report that he did — then surely the juvenile court did not act unreasonably in also finding it significant. (See maj. opn., ante, at p. 212.)
The majority’s explanation for finding otherwise is unpersuasive. (Maj. opn., ante, at pp. 185-186.) According to the majority, Dr. Kojian stated during his testimony that “he was TOO percent sure’ of his opinion” that R.V. was not malingering “notwithstanding” R.V.’s refusal to submit to testing. (Id. at p. 212.) However, the record indicates that this statement related, not to R.V.’s refusal to take a test for malingering or to Dr. Kojian’s opinion on that subject, but to R.V.’s refusal to take “any cognitive function test.” Later, in expounding on what made him believe that R.V. “flunked” the statutory competency test, Dr. Kojian stated rather equivocally, “It didn’t seem to me that [R.V.] was attempting to malinger his impairment.” At the *223 end of the direct examination, when asked specifically about malingering, Dr. Kojian again equivocally responded, “it didn’t seem to me to be malingering.” More broadly, notwithstanding the statement the majority cites, Dr. Kojian later expressed notably less certainty about his opinion regarding R.V.’s competence, indicating that, “to a reasonable degree of psychological certainty,” it was “probably correct.” To be sure, the majority’s “contextual]” reading of the equivocation in Dr. Kojian’s remarks — that it “demonstrated an attempt to express his opinion within professional parameters,” rather than “any reservations in his views” (ibid.) — is plausible. But the question here is not how we, as an appellate court, interpret Dr. Kojian’s remarks de novo on a cold record, but whether the contrary interpretation of a juvenile court that actually saw Dr. Kojian testify and observed R.V. in person is unreasonable. In my view, the statements the majority cites do not establish that the juvenile court acted unreasonably in considering a factor that Dr. Kojian himself expressly noted numerous times in his report — R.V.’s “unfortunate[]” refusal to submit to testing.
Moreover, in other respects, Dr. Kojian’s report and testimony furnished affirmative support for the juvenile court’s assessment of Dr. Kojian’s opinion regarding R.V.’s ability to assist counsel. At the outset, the report stated that, after being told of the interview’s purpose and receiving various advisements — that the interview was nonconfidential and voluntary and that a report would be sent to the court for use “in the current matter” — R.V. “noted that he understood the scope and intent of testing and volunteered to be interviewed.” According to the report, R.V.’s “grooming and hygiene were intact,” and he “was, largely, oriented and knew the day, date and location.” R.V. told Dr. Kojian that “[h]e was involved in counseling and did find it to be helpful.” R.V.’s mother told Dr. Kojian that R.V. “was able to meet developmental milestones on a timely basis.” As previously noted, the report observed that R.V. “knew, in general, the meanings of guilty or not guilty,” that the former “means he is ‘responsible’ ” and the latter means he “could be released home,” that “the court makes a decision,” and that “misdemeanors are less serious than felonies.” In a section entitled “Conclusion and Opinion,” the report stated that R.V.’s “thinking appeared to be impaired” (italics added), but then immediately explained that R.V. “[u]nfortunately . . . [had] refused to take any tests” that would provide “objective measures” of his functioning and had been “rather disinterested in answering questions.” It also explained that R.V.’s apparent cognitive issue did not “appear” to be “developmental in nature” and might have resulted from drug use.
At the hearing, Dr. Kojian stated that he did not know whether R.V. was “intellectually impaired.” When asked whether R.V. was “cognitively impaired,” Dr. Kojian responded equivocally: “My assessment of him was that *224 there was some type of cognitive process going on that did appear to be evidence for some type of cognitive impairment.” Dr. Kojian later testified that if R.V.’s cognitive issue was “substance induced in nature, then it might self-correct,” that “you don’t need to do anything except sit around and wait,” and that “nobody knows” how long it would take for the effect of the drugs to “wear off.” The district attorney followed up by asking whether R.V. “could be better” than he had been “16 days earlier” at the time of the interview. Dr. Kojian first responded, “You’re correctly pointing out that competency isn’t a static variable ... , so it changes.” After stating his opinion that R.V. was not competent “[o]n the day” of the interview or the day the report was signed, Dr. Kojian then noted that he was not responsible for the 16-day gap between the interview and the competency hearing, and stated, “No doctor can tell how an individual is ... on the day that they testify on [an] assessment that they conducted.” The district attorney then explained that he was asking about the time gap because Dr. Kojian had answered “no” when earlier asked at the hearing whether, in his opinion, R.V., “sitting here right now, was . . . competent.” Dr. Kojian, after reiterating his opinion that R.V. was not competent on the day the report was signed, stated: “I don’t know what his functioning is as he sits here today.”
In summary, the record shows considerable equivocation regarding Dr. Kojian’s opinion, contains affirmative indications of competence, reveals justifications for questioning Dr. Kojian’s reasoning process, and offers a case-specific reason for questioning the effect on Dr. Kojian’s assessment of the 16-day gap between the interview and the competency hearing. Of course, as the majority’s discussion demonstrates, there was evidence that could reasonably have led the juvenile court to accept Dr. Kojian’s opinion. Indeed, based on that evidence, were I making the competency determination de novo, like the majority, I might very well find Dr. Kojian’s opinion sufficient to sustain R.V.’s burden of proof. But, giving proper deference to the juvenile court’s decision — viewing the evidence in the light most favorable to the court’s decision, giving that decision the benefit of every reasonable inference, and resolving all conflicts in its favor — I cannot find that the court acted unreasonably in rejecting Dr. Kojian’s opinion or that the evidence was of such weight and character as to compel a finding of incompetence.[2]
*225 Finally, for two reasons, I do not agree with the majority that expert opinion “holds special significance in the juvenile competency setting,” or that a juvenile court, upon finding “flaws” in the “methodology and reasoning” of an expert who finds the minor to be incompetent, “should consider appointing a second expert to inform [its] view that the first expert’s opinion is inadequate.” (Maj. opn., ante, at p. 216.) First, I see no statutory basis for either statement. Regarding the latter, the majority cites no supporting authority of any kind. Regarding the former, the majority observes that section 709 requires a juvenile court to “appoint an expert, specially qualified in the field of child development, when there is substantial evidence raising a doubt regarding the minor’s competency.” (Ibid.) However, in adult criminal cases, the Penal Code requires a court to appoint an expert — sometimes two — if it “has a doubt about the mental competency of a defendant” (People v. Pokovich (2006) 39 Cal.4th 1240, 1245 [48 Cal.Rptr.3d 158, 141 P.3d 267]), yet expert testimony holds no special significance in such cases. It is true that section 709, subdivision (b), specifies that the expert appointed in a juvenile case “shall have expertise in child and adolescent development, and training in the forensic evaluation of juveniles, and shall be familiar with competency standards and accepted criteria used in evaluating competence.” But nothing about that mere specification of expertise confers “special significance” on an expert’s opinion in juvenile cases. (Maj. opn., ante, at p. 216.) The majority also cites In re John Z. (2014) 223 Cal.App.4th 1046 [167 Cal.Rptr.3d 811] (maj. opn., ante, at p. 216), but that decision holds only that a juvenile court unsatisfied with an appointed expert’s written report may not make a competency determination without first holding “a formal competency hearing at which [the expert can] testify concerning his [or her] report” (In re John Z., at p. 1058).[3] Here, of course, the juvenile court held such a hearing and made its decision only after listening to Dr. Kojian’s testimony.
Second, the majority’s statements appear to conflict with well-established principles that the majority expressly reaffirms earlier in the same paragraph: a juvenile court need not “defer to the opinion of an expert” and “an expert’s opinion is not determinative of the question of competency . . . .” (Maj. opn., ante, at p. 216.) In the context of these well-established principles, what does it mean to say that an expert’s opinion has “special significance”? (Ibid) How does a juvenile court factor this undefined term into its analysis? Why must a court that reasonably declines to defer to the expert’s opinion because of a flawed methodology or reasoning consider *226 appointing another expert to inform its view of the first expert’s opinion? Does such a court err if it does not appoint a second expert? In short, the majority’s statements, in addition to being without statutory basis, will create confusion and uncertainty for juvenile courts.
For the foregoing reasons, I dissent.

 All further unlabeled statutory references are to the Welfare and Institutions Code.

 The majority appears to lose sight of the applicable standard of review in proclaiming itself to be “[unjpersuaded” that Dr. Kojian’s opinion was “undermined” by the exchange about the 16-day gap between the interview and the hearing. (Maj. opn., ante, at p. 215.) Under that standard of review, the relevant question is whether, in light of the testimony, the juvenile court could not reasonably consider this gap as one factor in determining the weight of Dr. Kojian’s opinion. As already explained, on the record here, considering that gap would not be unreasonable.

 Another option, the court stated, was for the juvenile court to have waited for the report of another expert it had appointed after expressing dissatisfaction with the first report. (In re John Z., supra, 223 Cal.App.4th at p. 1058.)