Filed 10/6/14

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| ROBERT MEISTER et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> DUANE MENSINGER et al., <br><br> Defendants and Respondents. | H036861 <br> (Santa Cruz County <br> Super. Ct. No. CIS-CV160779) |

Appellants Robert Meister, Janice Meister and Kathryn Meister (hereafter collectively the Meisters) were preferred shareholders in Sesame Technologies, Inc. (Sesame), a now-dissolved software company. Respondent Duane Mensinger (Mensinger) was Sesame's chief financial officer and respondent Carl Koppel (Koppel) was its chief executive officer. Sesame experienced financial difficulties, and its assets were sold to a company, respondent ExtraView Corporation (ExtraView),[1] formed and owned by Mensinger. Sesame then dissolved, rendering the Meisters' preferred shares valueless.

The Meisters brought a civil action against respondents, alleging Mensinger and Koppel colluded to secure a preferential sale of Sesame's assets and business to ExtraView, thus violating their fiduciary duties to the Meisters. After a lengthy bench trial, the court issued a statement of decision in which it found that Mensinger and Koppel had breached their fiduciary duties to the Meisters, but that the Meisters had

---

[1] The company was initially named Staging Corp. and the name was changed to ExtraView at some undisclosed point thereafter.

failed to prove damages. The court subsequently entered judgment in favor of respondents.

On appeal, the Meisters argue: (1) the trial court erred in refusing to frame an appropriate remedy; (2) the trial court erred in conducting an in camera posttrial review of ExtraView's electronic financial records, rather than ordering an accounting of ExtraView's net worth and profit/loss status; and (3) during discovery and at the beginning of trial, the trial court abused its discretion by refusing to order production of ExtraView's electronic financial records in their native format.

We agree the trial court erred in failing to craft a remedy, as well as in conducting its own in camera review of financial documents. We will reverse and remand for a new trial limited to the issue of remedies.

## I. FACTUAL AND PROCEDURAL BACKGROUND

We recite the facts in the manner most favorable to the judgment and resolve all conflicts and draw all inferences in favor of respondents. (*SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 552-553.) Conflicts in the evidence are noted only where pertinent to the issues on appeal. (*Id.* at p. 553.)

### A. Sesame's formation and capitalization by the Meisters

Sesame was formed by Koppel and Rick Banister (Banister) in 1999. Koppel and Banister served on Sesame's board of directors, with Koppel also serving as president and chief executive officer, while Banister was Sesame's chief financial officer, chief technical officer as well as its corporate secretary until he left the company in September 2002. Banister subsequently resigned from Sesame's board in October 2002 and Koppel acquired the right to vote his shares. From February 2003 until July 2004, Koppel was Sesame's sole Board member.

From sometime in 2000 through August 2002, the Meisters invested a total of more than $2.1 million in Sesame. In exchange for these investments, the Meisters

2

received preferred shares, ultimately gaining an ownership interest of approximately 38 percent of the company. The Meisters' preferred shares gave them no voting rights or role in managing Sesame.

Sesame struggled financially throughout most of its existence. The company was not paying its employees and most other creditors in a consistent manner and owed approximately $485,000 to the IRS in back payroll taxes (including interest and penalties) dating from late 2001. Sesame was not earning enough to meet its monthly expenses, and further reductions in operating expenses were not possible.

The Meisters testified Koppel solicited further investments from them in August 2002 to pay off Sesame's liabilities, including the back payroll taxes. Koppel advised the Meisters that Sesame was experiencing severe financial problems and that their investment might not be sufficient to satisfy the company's debts. However, based on Koppel's representations that their investment would help the company attract more outside financing by reducing its outstanding debt, the Meisters gave Sesame an additional $600,000.

In conjunction with their final investment in August 2002, the Meisters entered into separate but identical agreements with Sesame setting forth their rights as preferred shareholders. Among other things, the agreements gave the Meisters a right of first refusal, a liquidation preference and a dividend preference.

Upon learning that Sesame was still struggling financially after making this investment in August 2002, the Meisters were upset with Koppel, believing they had been fraudulently induced to make that investment. Accordingly, the Meisters advised Koppel they would not consider further investments without full due diligence, adding, there was "no point in throwing good money after bad."

*B.      Mensinger hired as CFO and Sesame's continuing financial troubles*

In December 2002, Koppel hired Mensinger as Sesame's chief financial officer. Mensinger became a stockholder in Sesame the following month.

Sesame's financial problems continued and by February 2003, the company lacked cash to pay various liabilities due by the end of the month, including payroll, payroll taxes, various insurance premiums, rent, etc. Mensinger offered to provide Sesame a $125,000 loan to pay these expenses in exchange for a promissory note. Koppel was receptive to Mensinger's offer and testified he hoped Mensinger's demonstrated willingness to invest in Sesame would reassure the Meisters, possibly persuading them to make a further investment as well.

Throughout February 2003, Koppel contacted Robert Meister (Robert) multiple times regarding Mensinger's offer, seeking further investment from the Meisters and offering participation in a promissory note on the same terms. Robert responded by asking for more information regarding the loan, as well as for more time to consult with an attorney before deciding whether to participate or make further investments.

Robert testified respondents never discussed with him the full amount of the investment they were seeking from him and his family, nor was he ever provided with a copy of the promissory note Sesame actually issued to Mensinger. Instead, he was sent a different draft document on February 7, 2003, but that draft note did not include the terms under which Mensinger's note would be secured by Sesame's assets.

In later February 2003, Mensinger loaned Sesame $125,000 in exchange for a promissory note secured by Sesame's assets.

C.      *Negotiations with the IRS*

In March 2003, the IRS advised Mensinger it would file a lien on Sesame's assets unless the back payroll taxes were paid within one month. Within a few days of his meeting with the IRS, Mensinger filed a Uniform Commercial Code statement, perfecting his secured interest (via the promissory note) in Sesame's assets. In May 2003, Sesame and the IRS agreed to a repayment plan in which Sesame would make monthly payments over the next five years. In exchange, the IRS agreed to not file a lien on Sesame's assets.

4

At the time Mensinger made his loan to Sesame, his security interest in the company was subordinate only to a secured loan held by Coast Commercial Bank (Coast). In August 2003, Mensinger began using Sesame's available cash to pay off Coast's senior secured loan, rather than paying Sesame's other obligations, including the interest due on his promissory note. Koppel testified Coast's loan was repaid because it was threatening to declare a default otherwise. Once the loan was fully repaid by March 2004, Coact released its security interest in Sesame's assets. As a consequence, Mensinger became Sesame's senior secured creditor. By the end of April 2004, Mensinger declared his note in default.

D. *Sesame's continuing efforts to obtain additional funding* (*2001-2004*)

In 2001, Sesame first hired SiVal Advisors (SiVal), an investment banking firm, to help it raise venture capital. In late 2002, SiVal identified several obstacles to Sesame's ability to attract funding: Sesame's management problems, its outstanding debt, and the contentious relationship between Sesame's management and the Meisters. In September 2002, SiVal's written report detailing these obstacles was shared with the Meisters. SiVal was unable to secure venture capital funding for Sesame.

In fall 2003, Sesame again engaged SiVal to try to find a buyer, locate new investors or find a strategic partner for the company. Again, SiVal was unsuccessful.

In early 2004, SiVal entered into discussions with a company called FEI which was interested in acquiring Sesame. In March 2004, Robert met with SiVal's representative, Eugene Bernosky, and Koppel to discuss the possibility of a deal with FEI. Bernosky and Koppel cautioned Robert if the deal with FEI did not materialize and Sesame failed to meet its sales projections, Sesame would be in serious jeopardy. FEI terminated its discussions with Sesame in April 2004. Sesame fell short of its sales projections in 2004.

5

*E.     Exploration of Sesame's options in 2004*

In late April 2004, Mensinger spoke to Koppel about Sesame's continuing viability. Mensinger and Koppel met again with Bernosky to discuss financing options and the possibility of a strategic reorganization. Sesame also retained a workout and bankruptcy attorney to evaluate Sesame's options.

Koppel also met again with Robert to discuss Sesame's financial condition, and asked the Meisters to make a further investment in the company in conjunction with Mensinger's loan. The Meisters listened to Koppel's presentation but did not offer to provide additional funding.

By mid-2004, Mensinger and Koppel determined Sesame had two options: (1) a Chapter 7 bankruptcy liquidation; or (2) a sale of its assets to a new company created by Mensinger. They chose to pursue the second option.

*F.     Formation of ExtraView and its purchase of Sesame's assets*

On May 28, 2004, Mensinger and Koppel formed ExtraView at Sesame's address. Initially, Mensinger and Koppel each took a 50 percent interest in the new entity, but Koppel later sold his shares to Mensinger, who became ExtraView's sole owner. In June 2004, Koppel was named president, secretary and chief executive officer of ExtraView and Mensinger was named chief financial officer.

That same month, the IRS placed a lien on Sesame's assets due to its failure to pay the back payroll taxes as agreed. Mensinger suggested to the IRS that Sesame would transfer some assets to a company owned by certain of Sesame's creditors, but the IRS was opposed to any transaction in which unsecured creditors would receive any assets before its lien was satisfied. On June 28, 2004, the IRS advised Mensinger and Sesame's counsel that if Mensinger's secured note interest was $300,000, and Sesame's assets were valued at approximately the same amount, it would "value the government's interest at zero." Shortly thereafter, Mensinger and Koppel represented to the IRS that the value of Mensinger's secured interest in Sesame's assets was $404,279, the book value of

6

Sesame's assets was $403,918, and that the "Estimated Orderly Liquidation Value" of those assets was $478,743.

On July 28, 2004, Koppel appointed Mensinger to join him on Sesame's board of directors. The following day, Mensinger and Koppel voted to transfer Sesame's assets to ExtraView pursuant to an asset purchase agreement (APA). The board further resolved that once the APA was completed, Sesame would dissolve.

Under the terms of the APA, Sesame was to sell its assets to ExtraView. In exchange, ExtraView would: (1) assume Mensinger's note (valued at approximately $140,000) and assign him a continued security interest in Sesame's recently transferred assets; (2) indemnify Koppel against his personal liability to the IRS for Sesame's unpaid payroll taxes (approximately $150,000); (3) assume Sesame's pending customer support contract obligations (approximately $250,000 to $300,000); and (4) assume Sesame's lease (approximately $930,000). In total, Sesame received consideration of about $1.5 million. Mensinger further agreed to forgive his unpaid compensation claims against Sesame, which he calculated at approximately $287,000.

Sesame's board and a majority of Sesame's employee shareholders with voting rights approved the APA. Koppel, by virtue of his own shares along with his proxy to vote Banister's shares, controlled over 60 percent of Sesame's voting shares. Following approval of the APA, Sesame's employees, including Koppel, were offered positions at ExtraView. By July 31, 2004, Sesame's assets were transferred to ExtraView.

The Meisters were not advised about the APA until after it had been approved and Sesame's assets transferred.

Following the transfer of Sesame's assets to ExtraView, Sesame filed for Chapter 7 bankruptcy. The bankruptcy trustee concluded there were "no assets to administer for the benefit of creditors." The trustee subsequently obtained a discharge of bankruptcy.

7

### G.     Legal proceedings

In February 2005, the Meisters brought an action against respondents in Illinois, but that action was eventually dismissed in response to respondents' successful motion for forum non conveniens.

On July 3, 2008, the Meisters filed the underlying complaint against respondents in Santa Cruz County Superior Court alleging six causes of action:  (1) negligent breach of fiduciary duty; (2) intentional breach of fiduciary duty; (3) aiding and abetting in a breach of fiduciary duty; (4) violation of California Business and Professions Code section 17200 et seq.; (5) accounting; and (6) constructive trust.  The complaint sought the following remedies:  restitution; disgorgement of assets, income, and profits wrongfully obtained by respondents; an accounting of all funds wrongfully obtained from the Meisters; and/or the imposition of a constructive trust over all wrongfully-obtained assets, income, profits and monies.

### H.     Trial and expert valuation testimony

A bench trial was held on multiple days from March 15, 2010 to April 7, 2010. Seven witnesses were examined and nearly 400 exhibits were admitted.  During trial, the parties presented expert testimony on the value of Sesame and ExtraView, and the damages the Meisters had suffered as a consequence of respondents' conduct.

#### 1.     The Meisters' expert testimony

The Meisters' expert, Terry Lloyd, testified Sesame was worth between $9.8 million and $11.3 million in May 2004.  Lloyd derived this valuation of Sesame by applying multiples of 4.25 and 4.89 to Sesame's revenues.  Those multiples were based on the median average revenue to market value investment capital (MVIC) and the mean average gross profits to MVIC that he derived from looking at private software companies similar to Sesame which sold in the 2003-2004 timeframe.  Lloyd also explained that companies operating at a net loss, like Sesame, were still being purchased during this time frame, even if their balance sheets reflected negative stockholder equity.

According to Lloyd, a company's actual value could be much larger than the asset value reflected in its financial statements.

Lloyd also estimated ExtraView's value as of December 2009. To do so, he again took sales data for what he deemed to be comparable companies in 2009 and derived median average multiples based on those companies' sales prices, revenues and gross profits. According to his calculations, ExtraView's value as of December 2009 was approximately $12.2 million. Lloyd had to estimate ExtraView's 2009 revenues based on prior revenue projections because he had not been provided with the company's actual 2009 financials.

Lloyd further outlined what portion of Sesame's value in 2004 and ExtraView's value in 2009 belonged to the Meisters as the sole preferred shareholders in Sesame. He provided several damage estimates for the trial court to consider.

### 2. *Respondents' expert testimony*

Respondents' expert, Adam Meislik, offered his own report into evidence and testified that the appropriate median multiple, based on his selection of comparable companies, was 1.7 and that multiple should be applied against the trailing 12 months of a company's revenue. Meislik offered five principal opinions at trial: (1) The value of Sesame's assets as of July 2004 was between zero and $186,000; (2) the value of Mensinger's secured note was between zero and no more than $125,000, plus accrued interest; (3) Sesame made reasonable efforts, indeed, "extremely heroic efforts," to restructure its business and find new investors, merger partners, or alternative sales transactions; (4) the Meisters' preferred stock was not damaged by Sesame's sale of its assets to ExtraView; and (5) Sesame had been insolvent since at least October 2001 and therefore was insolvent at the time of the APA.

### I. *Statements of decision and judgment*

The trial court issued a tentative statement of decision in July 2010 (July 2010 SOD), in which it made the following pertinent findings: (1) Koppel and Mensinger

9

were controlling officers, directors, and shareholders of Sesame; (2) both Koppel and Mensinger had a personal interest in the transfer of Sesame's assets to ExtraView and approved the APA in their capacities as Sesame's controlling officers, directors, and shareholders; (3) the $125,000 note triggered the rights of first refusal in the Meisters' investment agreements; (4) respondents breached their fiduciary duties to each of the Meisters because they failed to provide the requisite notice that their rights of first refusal had been triggered, and respondents' actions were not inherently fair to the Meisters; (5) Koppel and Mensinger substantially assisted each other in the fiduciary breaches identified above; (6) respondents' conduct resulted in the loss of the Meisters' investment, as well as the loss of the Meisters' opportunity to earn dividends on their investment.

Regarding damages, the trial court ordered an "accounting as to the net worth and profit/loss status of ExtraView" because the "expert evaluations concerning either company [i.e., Sesame and ExtraView] were not conclusive." The trial court noted that "Plaintiffs' expert, Terry Lloyd, was constrained to the poorly framed evaluations of the Defendants and their representatives" in his testimony. The purpose of the accounting was to "determin[e] an equitable sum" that "should be appropriately awarded to the Plaintiffs to prevent unjust enrichment." In order to perform the accounting, the trial court ordered respondents to produce ExtraView's 2004 to 2009 QuickBooks records for its review. The trial court rejected the Meisters' suggestion that it appoint a referee to review those records, indicating it would review them itself but reserving the right to "retain its own consultant regarding the documentation if I have challenges in determining what it means."[2] From the record, it appears the trial court performed the accounting itself without the benefit of an expert.

---

[2] The trial judge, who volunteered that he was "an economics major," advised the parties he would notify them "before I have any other eyes look at anything."

10

Following a hearing on the July 2010 SOD, the trial court issued a statement of decision (January 2011 SOD).  In the January 2011 SOD, after reaffirming its finding that respondents had breached their fiduciary duties, the trial court concluded the Meisters had failed to meet their burden of proof on the issue of damages.  The trial court reiterated that the expert evaluations offered at trial were not persuasive.  As to the theory of unjust enrichment, the court indicated it was "hard-pressed to evaluate what aspect of the financial picture of ExtraView, if any, can be traced to the Sesame 'value' and what aspect is founded upon the efforts, over the past six years, of the ExtraView personnel, the further investment by its principals and changes (positive or negative) in the marketplace."  The documentation provided to the court for its in camera accounting, "along with previously submitted trial evidence, confirms that ExtraView continued with the net negative financial condition experienced by Sesame, that further investment was secured to keep the company afloat, and that the principals were continuing to miss paychecks."

Both the Meisters and respondents objected to the January 2011 SOD.  In their objections, the Meisters outlined what they saw as deficiencies in the trial court's reasoning underlying its finding.  They further objected to the court's consideration of additional evidence and argument provided by respondents, as well as objecting to the trial court's failure to award a remedy despite finding that respondents were liable.

Respondents' objections challenged the court's finding that they breached their fiduciary duties to the Meisters and raised many of the same affirmative defenses that had been rejected by the trial court, such as the manager's privilege, statute of limitations, etc.  Respondents also again claimed the evidence at trial demonstrated that Robert was the ostensible agent for his mother and sister.

After a hearing on the parties' objections, the trial court entered judgment in favor of respondents.  In its judgment, the trial court again reaffirmed its finding that respondents breached their fiduciary duties to the Meisters, but reiterated that the

11

evaluation of damages had been "challenging." According to the court, the evidence confirmed Sesame was in "dire financial condition," with "large debt, a constant need for a further infusion of cash, insufficient sales, failures to pay taxes, missed payrolls, and an unsuccessful attempt to locate a viable purchaser." However, after reviewing the testimony, the trial court did not find the evaluations of Sesame offered by the Meisters to be persuasive. Specifically, "[t]he testimony of plaintiffs [*sic*] witnesses as to the usage of multipliers upon certain aspects of financial data, or the usage of alleged comparable transactions in order to make a determination as to a company's value for damage and/or disgorgement purposes ignores the uncontroverted evidence that this company possessed minimal value, in light of the dire condition it was facing." As such, the trial court stated that the Meisters had failed to satisfy their burden of proof on the issue of damages.

## II.     DISCUSSION

### A.     *The trial court erred in failing to provide a remedy*

#### 1.     *Standard of review*

"When the trier of fact has expressly or implicitly concluded that the party with the burden of proof failed to carry that burden and that party appeals, it is somewhat misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. . . . Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 279.)

#### 2.     *Analysis*

The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach. (*City*

*of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 483.) There is a "strong public interest in assuring that corporate officers, directors, majority shareholders and others are faithful to their fiduciary obligations to minority shareholders." (*Steinberg v. Amplica, Inc.* (1986) 42 Cal.3d 1198, 1210.) Consistent with that interest, " '[s]elf-dealing in whatever form it occurs should be handled with rough hands for what it is--dishonest dealing. And while it is often difficult to discover self-dealing in . . . sale[s] of . . . assets or dissolution and liquidation, the difficulty makes it even more imperative that the search be thorough and relentless.' " (*Jones v. H.F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 111.)

In this case, after finding that Koppel and Mensinger owed fiduciary duties to the Meisters and breached those duties by transferring Sesame's assets to ExtraView, the trial court entered judgment in respondents' favor because it found the Meisters had not met their burden of proof on the element of damages. This was error.

While the damages suffered by the Meisters as a consequence of respondents' wrongdoing may not have been readily ascertained, it does not follow that the Meisters failed to establish the fact they were harmed by respondents' actions. Substantial evidence supports the trial court's conclusions that respondents breached their fiduciary duties to the Meisters, who consequently lost the entirety of their substantial investment in Sesame. The nature, existence, and cause of the Meisters' harm were thus certain. The question thus became one of determining the proper remedy, which we agree presents a difficult task. To guide the trial court on remand, we provide an overview of the remedies it should consider in reaching a solution.

### a. *Remedies for breach of fiduciary duty*

"Where a breach of fiduciary duty occurs, a variety of equitable remedies are available, including imposition of a constructive trust, rescission, and restitution, as well as incidental damages." (*Hicks v. Clayton* (1977) 67 Cal.App.3d 251, 264.) "Judicial

13

discretion to grant relief becomes judicial duty to grant it under some circumstances, and the grace which equity should bestow then becomes a matter of right." (*Id.* at p. 265.)

We begin with the legal remedy of damages, before examining the various available equitable remedies.

### i. Damages

"Damages" are monetary compensation awarded to parties who suffer detriment for the unlawful act or omission of another; they are assessed by a court against wrongdoers for the commission of a legal wrong of a private nature. (Civ. Code, § 3281; *Mente & Co., Inc. v. Fresno C. & W. Co.* (1931) 113 Cal.App. 325, 330.) Damages are a remedy *at law*. (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 835.) The focus of an award of damages is the quantification of detriment suffered by a party. (*Wainscott v. Occidental etc. Ass'n* (1893) 98 Cal. 253, 255.)

"Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty." (*GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 873.) "The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation. [Citation.] This is especially true where . . . it is the wrongful acts of the defendant . . . that have caused the other party to not realize a profit to which that party is entitled." (*Id.* at pp. 873-874.)

In business cases, damages are based on net profits, as opposed to gross revenue. (*Parlour Enterprises, Inc. v. Kirin Group, Inc.* (2007) 152 Cal.App.4th 281, 287.) Damages for lost profits from an established business are generally awardable where " 'there has been an operating experience sufficient to permit a reasonable estimate of probable income and expense.' " (*Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 989.)

"Historical data supply an acceptable basis for ascertaining lost or diminished benefits suffered by an established business. The occurrence and extent of lost profits

may be ascertained with reasonable certainty from the working experience of the business, from its past volume and from other data reflecting probable future volume. [Citations.] 'In these situations, trial courts must do the best they can and use all available facts to approximate the fair and reasonable damages under all of the circumstances.' " (*Guntert v. City of Stockton* (1976) 55 Cal.App.3d 131, 143 ["evidentiary imponderables are unavoidable"].) " '[I]f the business is . . . new . . . or . . . speculative . . . , damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like.' " (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 884.)

In this case it was undisputed that Sesame was not a profitable enterprise, and had it filed outright for dissolution in 2004, it is entirely possible the Meisters would have received nothing in return for their investments. Such risks are inherent in the realm of investing. We have no way of knowing if that would have occurred here however, since Mensinger and Koppel chose a different strategy to wind up the company, as detailed above.

Once a plaintiff has established the amount, "if the damages proven could be reduced proportionately, that burden rests upon the defendant." (*Fibreboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 705.) " '[Where] it is clear . . . a defendant has been at fault and . . . has caused some part of the plaintiff's damages, the burden of proof should rest on him to show the extent of his contribution, and . . . if he cannot sustain it he should be liable for the entire loss.' " (*Ibid.*)

### ii. *Restitution and unjust enrichment*

"An individual is required to make restitution if he or she is unjustly enriched at the expense of another. [Citations.] A person is enriched if the person receives a benefit at another's expense. [Citation.] Benefit means any type of advantage. [Citations.] [¶]

15

The fact that one person benefits another is not, by itself, sufficient to require restitution. The person receiving the benefit is required to make restitution only if the circumstances are such that, as between the two individuals, it is *unjust* for the person to retain it." (*First Nationwide Savings v. Perry* (1992) 11 Cal.App.4th 1657, 1662-1663.) "The object of restitution . . . is to eliminate profit" of the "conscious wrongdoer, *or* . . . defaulting fiduciary without regard to notice or fault . . . ." (Rest.3d Restitution and Unjust Enrichment, § 51(4), italics added.) Indeed, "[t]he object of the disgorgement remedy--to eliminate the possibility of profit from conscious wrongdoing--is one of the cornerstones of the law of restitution and unjust enrichment," and "[t]he profit for which the wrongdoer is liable by the rule of § 51(4) is the net increase in the assets of the wrongdoer, to the extent that this increase is attributable to the underlying wrong." (*Id.*, com. e.)

Disgorgement as a remedy is broader than restitution or restoration of what the plaintiff lost. (*County of San Bernardino v. Walsh* (2007) 158 Cal.App.4th 533, 542 (*County of San Bernardino*); *Feitelberg v. Credit Suisse First Boston, LLC* (2005) 134 Cal.App.4th 997, 1013 (*Feitelberg*).) There are two types of disgorgement: restitutionary disgorgement, which focuses on the plaintiff's loss, and nonrestitutionary disgorgement, which focuses on the defendant's unjust enrichment. (*Feitelberg*, *supra*, at p. 1013.) "Typically, the defendant's benefit and the plaintiff's loss are the same, and restitution requires the defendant to restore the plaintiff to his or her original position." (*County of San Bernardino*, *supra*, at p 542.) However, "[m]any instances of 'liability based on unjust enrichment . . . do not involve the restoration of anything the claimant previously possessed . . . includ[ing] cases involving the disgorgement of profits . . . wrongfully obtained . . . .' [Citation.] '[T]he public policy of this state does not permit one to "take advantage of his own wrong" ' regardless of whether the other party suffers actual damage. [Citation.] Where 'a benefit has been received by the defendant but the plaintiff has not suffered a corresponding loss or, in some cases, any loss, but nevertheless the

16

enrichment of the defendant would be unjust . . . the defendant may be under a duty to give to the plaintiff the amount by which [the defendant] has been enriched.' " (*Ibid*.; see *Feitelberg*, *supra*, at p. 1013.)

"The emphasis is on the wrongdoer's enrichment, not the victim's loss.  In particular, a person acting in conscious disregard of the rights of another should be required to disgorge all profit because disgorgement both benefits the injured parties and deters the perpetrator from committing the same unlawful actions again.  [Citations.] Disgorgement may include a restitutionary element, but it ' "may compel a defendant to surrender all money obtained through an unfair business practice . . . regardless of whether those profits represent money taken directly from persons who were victims of the unfair practice." ' [Citation.]  Without this result, there would be an insufficient deterrent to improper conduct that is more profitable than lawful conduct." (*County of San Bernardino*, *supra*, 158 Cal.App.4th at pp. 542-543.)

Subsection (5) of section 51 of the Restatement Third of Restitution and Unjust Enrichment explains that "[i]n determining net profit the court may apply such tests of causation and remoteness, may make such apportionments, may recognize such credits or deductions, and may assign such evidentiary burdens, as reason and fairness dictate, consistent with the object of restitution as specified in subsection (4). . . ."  The Restatement further explains that "[p]rofit includes any form of use value, proceeds, or consequential gains [citation] that is identifiable and measurable and not unduly remote." (*Id*., subsec. (5)(a).)

In measuring the amount of the defendant's unjust enrichment, the plaintiff may present evidence of the total or gross amount of the benefit, or a reasonable approximation thereof, and then the defendant may present evidence of costs, expenses, and other deductions to show the actual or net benefit the defendant received.  "The party seeking disgorgement 'has the burden of producing evidence permitting at least a reasonable approximation of the amount of the wrongful gain,' " and the " '[r]esidual risk

17

of uncertainty in calculating net profit is assigned to the wrongdoer.' " (*Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 894.)

### *iii.     Constructive trust*

Another remedy tied to the concept of unjust enrichment is "constructive trust." "A constructive trust is an involuntary equitable trust created by operation of law as a remedy to compel the transfer of property from the person wrongfully holding it to the rightful owner. [Citations.] The essence of the theory of constructive trust is to prevent unjust enrichment and to prevent a person from taking advantage of his or her own wrongdoing." (*Communist Party v. 522 Valencia, Inc.* (1995) 35 Cal.App.4th 980, 990.) The issue of whether to impose a constructive trust is an equitable issue for the court. (See *Fowler v. Fowler* (1964) 227 Cal.App.2d 741, 747 ["it is for the trial court to decide whether" the plaintiff has proven entitlement to a constructive trust].)

### *b.     Proceedings on remand*

As the trial court noted, determining the amount of monetary damages suffered by the Meisters presents a challenge. The trial court must consider, consistent with the Restatement, that " '[w]here a person is entitled to a money judgment against another because by fraud, duress or other consciously tortious conduct the other has acquired, retained or disposed of his property, the measure of recovery for the benefit received by the other is the value of the property at the time of its improper acquisition, retention or disposition, or a higher value if this is required to avoid injustice where the property has fluctuated in value . . . .' " (*Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal.App.4th 663, 698-699.) In this case, it is undisputed respondents received at least one benefit--ownership of Sesame's assets free and clear of the Meisters--as a consequence of their actions. There may have been a dispute about how to value this benefit, but the nature of the benefit itself was clear.

On remand, the trial court must decide Sesame's value at the time its assets were transferred to ExtraView and the Meisters' ownership interest was rendered worthless.

18

Both sides presented evidence on this question, and though the trial court was not persuaded by the valuation provided by Lloyd, it seems clear that Sesame had *some* value, at least to Mensinger and Koppel. Since 2000, the Meisters invested over $2.1 million in Sesame, and the assets gained by respondents had been developed, at least in part, through the Meisters' investments. By obtaining these assets, ExtraView could essentially hit the ground running with Sesame's intellectual property, customers, brand, employees, etc. Respondents' efforts to keep these assets under their control, rather than dissolve Sesame outright, evidence their conviction that it could become a profitable enterprise, once it was shed of its liabilities, including the liability (real or perceived) of the Meisters' ownership interest. The trial court should revisit the parties' valuations paying particular attention to what ExtraView paid for Sesame's assets. Presuming the expert evidence can provide a reasonable approximation of that total value, it should of course be reduced to reflect the Meisters' partial ownership interest, i.e., 38 percent.

The question of whether ExtraView was subsequently profitable or whether Koppel and Mensinger were subsequently enriched in some way should also be reexamined. Following an *in camera* review of ExtraView's QuickBooks financial records, the trial court determined that the Meisters were not entitled to an award based on unjust enrichment because such an award could not be calculated in a "mechanical and undemanding" fashion. That is not the appropriate standard, however. The calculation of unjust enrichment is, like any other calculation, sometimes simple and sometimes complex. Merely because the calculation is more complex does not mean that the remedy is unavailable, however. As we have previously noted in discussing the concept of unjust enrichment, "[t]here is no standard formula to measure it." (*Ajaxo Inc. v. E*Trade Financial Corp.* (2010) 187 Cal.App.4th 1295, 1305.) "Recovery is not prohibited just because the benefit cannot be precisely measured. But as with any other pecuniary remedy, there must be some reasonable basis for the computation." (*Ibid.*)

19

The parties' experts, who gained access to ExtraView's QuickBooks financial records from 2004 to 2009 at the same time as the trial court, should revisit their analyses of ExtraView's operations during that time frame and render an opinion on those issues. It may be that ExtraView continued to struggle and that Koppel and Mensinger continued to forego their salaries or inject their own capital in order to keep the company solvent, in which case there were no secret profits or unjust enrichment following the asset transfer. It may be the opposite. Obviously, in calculating ExtraView's subsequent profitability, respondents are entitled to "credit for money expended in acquiring or preserving the property or in carrying on the business that is the source of the profit subject to disgorgement." (Rest.3d Restitution and Unjust Enrichment, § 51(5)(c); accord, *Uzyel v. Kadisha*, *supra*, 188 Cal.App.4th at p. 894.) If some amount of unjust enrichment can be adequately shown, the trial court may allow the Meisters to recover a portion of those proceeds, again reduced by the percentage ownership interest they had in Sesame's assets.

Ultimately, however, the remedy chosen by the trial court must be linked to a particular breach of fiduciary duty, and thus the timing of that breach is critical to formulating the character of that remedy as well as its scope. Accordingly, on remand, the trial court should specify the timing of the breach which leads to the remedy it imposes. We emphasize that we are *not* remanding the matter for retrial of the issue of liability, as there is substantial evidence to support the trial court's findings that Koppel and Mensinger breached their fiduciary duties to the Meisters.

The Meisters also suggest we direct the trial court to impose a constructive trust over 38 percent of the ExtraView shares held by Mensinger. Such a remedy would, in their view, be equitable since Mensinger through his fiduciary breaches obtained 100 percent ownership in ExtraView. We express no opinion on whether a constructive trust is an appropriate remedy in this particular case. It is up to the trial court to decide if such a trust is preferable to the other available remedies.

20

*B.      The Meisters' efforts to obtain ExtraView's financial records*

*1.      Factual and procedural background*

In May 2009, the Meisters propounded requests for production of documents on respondents, specifically seeking production of ExtraView financial documents in native format.  When respondents refused to produce the financial records in native format, the Meisters brought a motion to compel on September 30, 2009.  In that motion the Meisters argued that respondents "purposefully and improperly produced documents which are normally kept as Excel documents in PDF format," and thus violated their obligations under the discovery statutes by "failing to produce the documents in the requested native format."  The trial court agreed and granted the Meisters' motion.

Following the hearing, counsel conferred over the terms of the proposed order, at which point the Meisters first learned that ExtraView's financial records were maintained in Quicken,[3] not Excel.  The Meisters brought this to the attention of the trial court and asked that the proposed order specify that the documents be produced in their " 'native' format, Quicken."  The court's order directed respondents to produce the requested documents "in native format," though it failed to include Quicken as requested by the Meisters.  Respondents subsequently moved for "clarification" or, alternatively, reconsideration of that order, arguing that it should be modified to deem production of records in Excel format sufficient.

The Meisters opposed the reconsideration motion, arguing that production of the financial documents in Excel spreadsheets was insufficient in that it did not allow access to the data in some cells, and other cells were hidden or locked from being viewed.  Accordingly, the Meisters' financial experts would be hindered in their ability to provide

---

[3] The Meisters subsequently determined that the records were maintained in a related software program, QuickBooks.

21

an informed opinion on the Meisters' damages. The judge rejected these arguments and ruled that production in Excel spreadsheets was sufficient.

Before trial, the Meisters renewed their efforts to obtain ExtraView's QuickBooks financial statement, serving a notice to appear at trial with specified documents. Respondents objected, and the trial court ordered the matter briefed.

The Meisters submitted a declaration from their financial expert, Lloyd, in which he stated that review of ExtraView's QuickBooks records would aid him in rendering an expert opinion on the value of Sesame and ExtraView, as well as the value of the software, etc. The QuickBooks records would allow Lloyd to identify payments to certain individuals and vendors, further identify ExtraView's customers, establish which customers are paying and which are not, establish amounts spent on research and development, and allow further analysis of the treatment of certain "undeposited deposits" recorded on the Excel documents previously produced by respondents.

The parties argued the matter during trial, prior to any expert testimony being offered. The trial court refused to order respondents to produce ExtraView's QuickBooks records for review. The trial court said it wanted to first hear the evidence and determine the validity of the Meisters' theories of recovery before ordering production of those records.

Following the trial, the court ordered an accounting to assist it in addressing the issue of remedies. In conducting this accounting, the trial court directed respondents to provide it and the Meisters with ExtraView's QuickBooks financial records from 2004 to 2009. The court reviewed these records on its own; apparently in an attempt to derive how much of ExtraView's value in 2009 could be attributed to Sesame's assets. Following that review, the trial court concluded that ExtraView, like Sesame, continued to lose money and required further investments to remain in operation. Accordingly, it was unable to ascertain how respondents were enriched, let alone unjustly enriched, by their conduct.

22

*2.     Analysis*

We first dispose of the Meisters' claim that the trial court erred in denying discovery of the ExtraView QuickBooks financial records as moot. Those records, the relevance of which is readily apparent given that the trial court required their disclosure in connection with its own accounting, were provided to the Meisters at the same time as they were provided to the trial court. The error, such as it was, has therefore been rectified and those records are now available to the experts for their review in connection with the proceedings on remand.

As to the remaining issue, we find the trial court's in camera review of those records, without assistance or input from qualified experts, was improper.

"An accounting cause of action is equitable in nature, and may be sought 'where . . . the accounts are so complicated that an ordinary legal action demanding a fixed sum is impracticable.' " (*Civic Western Corp. v. Zila Industries, Inc.* (1977) 66 Cal.App.3d 1, 14.) The right to an accounting will often arise where the defendant has abused a special relationship with the plaintiff, such as in cases involving trusts, partnerships and domestic relations, or fiduciary relationships. (See *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 593-594.) In such cases, the review of financial records in a complicated business tort case is better left to qualified forensic accountants and others who have devoted years to developing their expertise in this field.

## III.    DISPOSITION

The judgment is reversed. The matter is remanded to the trial court for retrial limited to the issue of damages. The Meisters are entitled to their costs on appeal.

23

_____
                                 Premo, J.

WE CONCUR:


_____
      Rushing, P. J.




_____
      Elia, J.




Meister et al. v. Mensinger et al.
H036861

| Trial Court: | Santa Cruz County Superior Court<br>Superior Court No. CIS-CV160779 |
| --- | --- |
| Trial Judge: | Hon. Timothy R. Volkmann |
| Counsel for Plaintiffs/Appellants:<br>Robert Meister, Janice Meister,<br>Kathryn Meister | Baker & McKenzie<br>Tod L. Gamlen<br>Brian K. Tomkiel<br>Michael N. Westheimer |
| Counsel for Defendants/Respondents:<br>Duane Mensinger, Carl Koppel,<br>ExtraView Corp. | Sheppard, Mullin, Richter & Hampton<br>Robert J. Stumpf, Jr.<br>Steven H. Winick |

Meister et al. v. Mensinger et al.
H036861