Filed 11/30/20

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CENTER FOR HEALTHCARE EDUCATION AND RESEARCH, INC., <br><br> Plaintiff, Cross-defendant and Respondent, <br><br> v. <br><br> INTERNATIONAL CONGRESS FOR JOINT RECONSTRUCTION, INC., <br><br> Defendant, Cross-complainant and Appellant; <br><br> MARK SACARIS, <br><br> Cross-defendant and Respondent. | D076513 <br><br><br> (Super. Ct. No. 37-2017-00004475-CU-BC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth J. Medel, Judge. Reversed.

Duckor Spradling Metzger & Wynne, Scott L. Metzger and William P. Keith for Defendant, Cross-complainant and Appellant International Congress for Joint Reconstruction, Inc.

Law Offices of Stephen B. Morris and Stephen B. Morris for Plaintiff and Respondent Center for Healthcare Education and Research, Inc., and Cross-defendant and Respondent Mark Sacaris.

In 2009, the president of the International Congress for Joint Reconstruction, Inc. (ICJR) retained Mark Sacaris, part owner of the Center for Healthcare Education and Research, Inc. (CHE), to assist ICJR in producing medical education conferences on the subject of joint-reconstruction surgery. Their agreement was unwritten, and there was no discussion of the rates ICJR would be charged. Sacaris was given full control over ICJR's money accounts as part of the arrangement. He was later made a chief operating officer (COO) and nonvoting director of ICJR.

Sacaris provided all of the services ICJR required through CHE. He unilaterally set rates for these services, adding a markup on labor costs to create a profit for CHE and, indirectly, for himself. He used ICJR's money accounts to pay CHE's invoices without notifying ICJR's board members of the amounts ICJR was being charged. Over time, and also without informing the board of ICJR, he increased the scope of CHE's services to include developing ICJR's websites and broadcasting live surgeries to ICJR conferences (despite CHE employees' lack of necessary experience in these areas), and he arranged for CHE to manage symposia for pharmaceutical companies during ICJR conferences. Sacaris thereby created additional sources of profit for CHE, and indirectly for himself, but he did not disclose his interest in these arrangements to ICJR.

In 2016, the board of ICJR was informed by Sacaris that ICJR had amassed a $2 million debt to CHE. ICJR terminated its relationship with Sacaris and CHE. CHE filed suit to recover amounts it claimed it was owed by ICJR under the agreement. ICJR filed a cross-action against Sacaris and

CHE in which it asserted they had secretly profited from their relationship with ICJR. ICJR sought, among other remedies, disgorgement of the profits CHE and Sacaris recovered in breach of their fiduciary duties, namely (1) their undisclosed charges for management services; (2) amounts by which they overcharged for web development services; (3) undisclosed profits from running symposia for pharmaceutical companies; and (4) undisclosed profits from broadcasting live surgeries.

After a bench trial, the court issued a statement of decision in which it found ICJR liable to CHE for breach of contract. Although the court also found that CHE and Sacaris breached their fiduciary duties to ICJR in earning all four categories of the profits ICJR sought to disgorge, the court awarded ICJR recovery only as to categories two and four. The court denied ICJR disgorgement of the first category of profits because it found ICJR had failed to prove it suffered monetary damages from CHE and Sacaris's undisclosed charges for management services. The court denied ICJR disgorgement of the third category of profits because it found ICJR failed to establish that running pharmaceutical symposia was an ICJR corporate opportunity CHE and Sacaris wrongfully usurped.

On appeal, ICJR contends the trial court erred in determining that ICJR could not recover disgorgement of CHE and Sacaris's profits from their undisclosed charges for management services without proof their breach of fiduciary duties caused ICJR to suffer monetary damages. ICJR also challenges the court's determination that the symposia were not an ICJR corporate opportunity.

We agree ICJR was not required to show it suffered monetary harm to establish a right to disgorgement of CHE and Sacaris's profits from their undisclosed charges for event management services, and that the trial court

3

erred when it held otherwise. Because ICJR met its burden to establish a reasonable approximation of the amount by which CHE and Sacaris profited through their misconduct, the court was required to exercise its discretion to fashion a remedy. We will reverse the portion of the judgment affected by the error and remand so the trial court can determine the appropriate amount of the award of disgorgement. However, we reject ICJR's claim that the court erred in determining that running symposia for pharmaceutical companies was not a corporate opportunity of ICJR.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Factual Summary*[1]

In 2008, a small number of nationally prominent orthopedic surgeons formed ICJR[2] for the purpose of presenting accredited continuing medical education conferences on the subject of joint-reconstruction surgery. It had become common in the years before ICJR's formation for prosthetic device manufacturers to sponsor conferences, a practice that led to concerns over the conferences' educational value and attracted the scrutiny of the United States Department of Justice under the Physician Payments Sunshine Act (42 U.S.C. § 1320a-7h), a reporting statute that requires medical device manufacturers to report transfers of value to physicians. The orthopedic

---

[1]    "We recite the facts in the manner most favorable to the judgment and resolve all conflicts and draw all inferences in favor of respondents. [Citation.] Conflicts in the evidence are noted only where pertinent to the issues on appeal." (*Meister v. Mensinger* (2014) 230 Cal.App.4th 381, 387 (*Meister*).) Because trial court's factual findings are for the most part unchallenged, we derive our factual summary in large part from the court's final statement of decision.

[2]    ICJR was originally organized under Illinois law but was subsequently reorganized as a California nonprofit corporation.

4

surgeons who established ICJR believed the quality and stature of medical education conferences about joint reconstruction surgery would be improved if the conferences were overseen by medical experts.

The board members of ICJR were volunteers with active medical practices who lacked the time and business expertise to produce medical conferences. Shortly after ICJR was formed, its president, Dr. William Norman Scott, met Sacaris, whose employment history included organizing educational conferences and providing management support for pharmaceutical companies. Sacaris and his business partner, Steve Coley, provided these services through two companies, Tier One Corporation (Tier One) and CHE. Sacaris and Coley each owned half of the shares of Tier One. Tier One, in turn, owned CHE. Both Tier One and CHE were for-profit enterprises; Sacaris and Coley profited directly from the earnings of Tier One and indirectly from the income of CHE. Sacaris was the president of CHE and managed its day-to-day operations. He was also responsible for setting the billable hourly rates CHE charged its clients.

Scott hired Sacaris in June of 2009 to coordinate and manage conferences for ICJR and ensure all logistical details necessary for a successful conference took place. Both men described this as a "handshake" agreement; there was never a written contract between Sacaris and ICJR. Moreover, Sacaris never provided, and Scott never requested, any information about the rates ICJR would be charged for his services.[3]

---

[3]     The record contains very little information about the composition of ICJR's board, its corporate bylaws or adherence to corporate formalities. ICJR's board members would convene each year while attending another annual medical event. Sacaris claimed he provided financial updates during these meetings, although the record before us contains only two such updates, one relating to a single conference in Australia in 2014 and another covering the first eight months of 2013; neither mentions CHE. Sacaris also

From the beginning, Sacaris provided all of ICJR's management service needs through CHE. At trial, the parties disputed whether ICJR had agreed to or was even aware of CHE's participation. Sacaris testified that he viewed himself as an agent of CHE, and that in his mind, by retaining him, ICJR had also retained CHE. While he claimed to have disclosed CHE's existence during conversations with Scott, his communications with the board were less than transparent. In two written updates sent to the full board in October 2013 and April 2014, he characterized CHE employees as being part of ICJR's organizational structure. It was not until July 2014 that he first notified the full board of CHE's existence.

Scott testified he was aware of CHE from the start and associated it with Sacaris, but at trial he could not recall what he had understood about CHE's role in the arrangement with ICJR at the time he retained Sacaris's services. He also testified that he was not made aware that certain individuals Sacaris had hired to work for ICJR were actually employees of CHE. The trial court found, "based on [] Scott's awareness of CHE, coupled with his failure to recall what he was told about CHE's involvement," that "ICJR did not prove that Dr. Scott was ignorant or unaware of CHE's role in the management of ICJR throughout the chronology." The parties do not challenge this finding.

As part of the arrangement with ICJR, Sacaris was given full control over ICJR's money accounts, including its checking account, for payment of

---

testified that he spoke to Scott every month, to ICJR's treasurer two or three times per year, to ICJR's secretary once a year, and to another ICJR board member two or three times per year. The record is silent with regard to the authority each of these individuals possessed on behalf of ICJR. However, Scott appears to have exercised the greatest degree of oversight and control over Sacaris's activities.

all invoices and expenses associated with ICJR's conferences. As a result, Sacaris had the ability to prepare and adjust his own bill as manager of CHE, and then approve payment of CHE's bill on behalf of ICJR, without the knowledge or approval of ICJR's board of directors, a circumstance the court found "created an obvious conflict of interest."

Sacaris and CHE organized and ran conferences for ICJR from 2009 until 2016. As ICJR proposed conferences to Sacaris, Sacaris dispatched up to 11 CHE employees to do the work necessary to arrange them.

Sacaris profited by funneling the services provided to ICJR through CHE. CHE employees, including Sacaris, billed for their services by the hour. As conferences were completed, Yana Drozdova, CHE's accountant, would prepare internal worksheets for Sacaris that summarized the hourly rates, and number of hours billed, for every CHE employee. Sacaris, on behalf of CHE, would then increase the employees' hourly rates by between 17 percent and 20 percent to reimburse CHE for its overhead expenses, and he would add an additional markup of up to 80 percent of the employees' hourly rates to create a profit for CHE, and indirectly, for himself.[4] Sacaris did not disclose to ICJR that he was profiting by marking up its labor costs.

_____

[4] In 2013, this markup process raised CHE employees' bottom-line hourly rates by 20 percent for CHE's overhead, and an additional 80 percent for CHE's profit margin. In 2014, the markups raised employees' hourly rates by 17 percent for CHE's overhead, and 70 percent for its profit margin. In 2015, Sacaris marked up employees' hourly rates (including his own) by 17 percent for overhead, and between 30 percent and 55 percent for CHE's profit margin; and in 2016, the rates were marked up by 17 percent for overhead and 55 percent for profit margin. In 2013, CHE billed over 9,000 hours to ICJR; in 2014, CHE's hours for ICJR exceeded 6,800; in 2015, CHE billed over 17,000 hours to ICJR; and in 2016, CHE billed over 6,300 hours for services provided to ICJR.

Once Sacaris determined the amounts to be billed to ICJR, Drozdova would create an invoice. The resulting invoices were transmitted to no one other than Sacaris. Sacaris would then approve payment on behalf of ICJR and would direct Drozdova to issue payment to CHE out of ICJR's checking account. In the trial court's words, ICJR was thus kept "completely blind to the amounts billed by CHE for services and expenses as no invoice or billing information was ever submitted to any of the ICJR Board of Directors, including its president and treasurer."

Over time, Sacaris and CHE expanded the scope of the services they were providing to ICJR. Sacaris assigned CHE the work of developing and maintaining ICJR's websites, even though CHE employees had little or no experience in website development, a fact Sacaris did not disclose to ICJR. As a result, ICJR was overbilled for website development services and was left without a working website.

One feature of ICJR conferences was the live broadcast of joint replacement surgeries performed offsite at remote locations. Sacaris initially hired outside professionals to produce these broadcasts. Later, Sacaris convinced his business partner, Coley, to secretly form a new company called Live Surgery to perform the professional audio-visual work Sacaris had previously outsourced. Live Surgery was owned by Tier One, which meant Live Surgery's profits were divided by Sacaris and Coley. After Live Surgery's formation, Sacaris began assigning all of ICJR's broadcasting needs to Live Surgery, never informing ICJR of his interest in the company. The quality of Live Surgery's broadcasts was poor, which led conference attendees to complain and harmed ICJR's reputation.

Pharmaceutical companies approached Sacaris about the possibility of conducting brief symposia to promote their medications at opportune times

8

during ICJR conferences. Sacaris, on behalf of ICJR, granted permission for the symposia conditioned on the companies paying substantial honoraria to ICJR. However, without informing ICJR, Sacaris also arranged to have CHE run the symposia for the pharmaceutical companies, creating an additional source of profit for himself.

In 2013, Sacaris was made a chief operating officer of ICJR and a nonvoting member of its board of directors. The change in Sacaris's official role at ICJR had no corresponding effect on his billing practices. He continued to invoice ICJR, and pay CHE, without notifying anyone at ICJR other than himself.

At times, there were insufficient funds in ICJR's account to pay CHE's invoices. When this occurred, CHE would advance the invoiced amounts with the expectation of being reimbursed by ICJR when its account was replenished. As time passed, ICJR's debt to CHE grew. Despite grossing $20 million over the course of its relationship with Sacaris, ICJR began to operate at a loss.

In February of 2016, Sacaris informed the board that ICJR had amassed a debt to CHE of $2 million and demanded payment. Not long after, a CHE employee shared concerns about CHE's billing practices with members of the board.[5] In the trial court's words, both pieces of information came as "a shock to Dr. Scott and the Board and led ICJR to . . . discover: (1) the details of Mr. Sacaris's and CHE's billing practices vis-[a]-vis ICJR, (2) that pharmaceutical companies had hired Mr. Sacaris and CHE to conduct and manage symposia held at ICJR conferences, and (3) that

---

[5]    The employee's concerns included that he and other CHE employees were required to bill ICJR when they took time off, meaning ICJR was billed for hours that CHE employees did not actually work.

9

Mr. Sacaris and Mr. Cole[y,] through their company[,] Tier One[,] had formed a new company called Live Surgery to replace previous companies that had broadcast orthopedic surgeries from a remote location to ICJR conferences."

ICJR investigated CHE's billing practices and terminated its relationship with Sacaris and CHE in January 2017 without paying the demand. It retained a new firm, a nonprofit entity called the Foundation for Orthopedic Research and Education (FORE), to replace CHE.

B.    *Procedural Background*

On February 3, 2017, CHE filed a form complaint against ICJR that stated a single cause of action for breach of contract and sought $2,400,000 in damages. ICJR, in turn, filed a cross-complaint against both CHE and Sacaris, alleging that Sacaris, through CHE, had secretly profited from Sacaris's relationship with ICJR. ICJR asserted causes of action against Sacaris and CHE for breach of fiduciary duty, fraud, negligence, conversion, violation of Business and Professions Code section 17200, constructive trust, and accounting. In its prayer for relief, ICJR sought to recover damages as well as "disgorgement and restitution of all profits and gains obtained by [CHE and Sacaris's] illegal and improper acts and omissions," among other remedies.

1.    *Trial*

The action and cross-action were tried in a four-day bench trial in January 2019. At trial, ICJR offered little opposition to CHE's breach of contract claim apart from noting that CHE appeared to have duplicated an item of its alleged damages (hotel costs of $133,799).

Instead, ICJR focused on offsetting CHE's damages by recovering under its cross-claims. ICJR identified four ways in which CHE and Sacaris had allegedly breached their duties to ICJR under the cross-claims and

10

sought disgorgement of the undisclosed profits recovered through each form of misconduct.  These four categories of wrongdoing and associated relief were:  (1) the profits CHE and Sacaris earned from the management services provided to ICJR, on the theory that their failure to disclose the amounts they were charging or compensating themselves for their services breached their fiduciary duties to ICJR; (2) the amount by which CHE and Sacaris overbilled ICJR for managing and developing ICJR's websites, without disclosing their fees or their employees' lack of necessary website development experience; (3) the amount by which CHE and Sacaris profited by assisting pharmaceutical companies with mid-conference symposia, without disclosing this arrangement to ICJR; and (4) the amount by which Sacaris profited by running ICJR's live surgery broadcasts through Live Surgery, while actively concealing his interest in Live Surgery from ICJR.

ICJR designated Robert Taylor, a certified public accountant and business valuation expert, to review CHE's financial records and opine as to the dollar value of each of these four categories of recovery.  Taylor testified that between 2013 and 2016,[6] CHE (and indirectly, Sacaris) had (1) created profits of $1,430,260 for the event management services CHE provided to ICJR by marking up their hourly labor rates; (2) overbilled ICJR by $800,000 for managing and developing ICJR's websites (a calculation also supported by the opinion of a website development expert); (3) earned net profits of

_____

[6]    ICJR sought to recover amounts CHE and Sacaris earned during the four-year period preceding the filing of its cross-complaint, which corresponds to the four-year statute of limitations that applies to a cause of action for breach of fiduciary duty.  (Code of Civ. Proc., § 343; *Manok v. Fishman* (1973) 31 Cal.App.3d 208, 213.)

11

$608,027 for assisting pharmaceutical companies with symposia during ICJR conferences; and (4) profited by $73,310 from the operations of Live Surgery.

CHE and Sacaris did not dispute the accuracy of these figures. However, Sacaris testified that CHE's rates were reasonable, and Sacaris and Drozdova each testified that the rates CHE charged ICJR were lower than the rates it charged other clients. These assertions were unaccompanied by supporting documents or other corroborating evidence.

The parties filed requests for a statement of decision. On May 9, 2019, the court issued a tentative statement of decision to which ICJR objected, including on the grounds it now asserts on appeal. On May 31, 2019, the court held a hearing on ICJR's objections.

### 2. *Statement of Decision*

On June 21, 2019, the trial court issued its final statement of decision, which was substantially unchanged from its tentative statement of decision. The court found in favor of CHE on its breach of contract claim and awarded $2,299,259.42 in damages, representing the amount requested by CHE minus the duplicative item contested by ICJR. The court then considered whether ICJR had proven its cross-claims by separately analyzing the factual and legal merits of each of its four theories of wrongdoing and associated remedies.

#### (i) *Income Received Directly by CHE and Indirectly by Sacaris for Management Services Provided to ICJR*

The trial court denied ICJR recovery under its first theory of wrongdoing. Although it found that CHE and Sacaris were managers, and thus fiduciaries, of ICJR throughout their relationship with ICJR, that Sacaris's fiduciary duties were heightened once he became a COO and director of ICJR, and that CHE and Sacaris breached their fiduciary duties throughout their relationship by failing to disclose any information about the

12

amounts they were charging ICJR, and compensating themselves, for their services, it also found that ICJR failed to prove it was overcharged and thus suffered economic damages from the breach.

### (ii) *Web Development*

The court found CHE and Sacaris breached their fiduciary duties by failing to disclose the amounts they were charging ICJR for website work and their lack of necessary experience in web development. The court awarded ICJR $800,000 on this claim, finding ICJR succeeded in proving it was overbilled by this amount for website development work.

### (iii) *Pharmaceutical Symposia*

The court denied ICJR recovery based on CHE's and Sacaris's failure to disclose that they were managing, and profiting from, the pharmaceutical company symposia. The court found that while Sacaris and CHE breached their fiduciary duties by failing to disclose to ICJR that they had agreed to manage the symposia, that ICJR suffered no harm from the nondisclosures since organizing symposia for pharmaceutical companies was not an opportunity ICJR would have considered for itself.

### (iv) *Live Surgery*

The court found Sacaris and CHE breached their fiduciary duties and defrauded ICJR by actively concealing Sacaris's interest in Live Surgery, of which he was a de facto owner through his half ownership of Tier One. It awarded ICJR $73,310 for this misconduct, finding this was the amount by which Sacaris had profited through Live Surgery.

### 3. *Judgment*

On August 29, 2019, the court entered judgment (1) in favor of CHE on CHE's cause of action for breach of contract in the amount of $2,299,259.42; (2) in favor of ICJR and against Sacaris and CHE as to ICJR's cross-claim for

breach of fiduciary duty (first cause of action) relating to website overbilling, in the amount of $800,000; (3) in favor of ICJR and against Sacaris and CHE as to ICJR's cross-claims for breach of fiduciary duty and fraud (first through third causes of action), pertaining to amounts billed through Live Surgery, in the amount of $73,310.00; (4) in favor of CHE and Sacaris and against ICJR as to ICJR's cross-claims for breach of fiduciary duty and fraud (first through third causes of action) based on ICJR's remaining theories of recovery; (5) dismissing ICJR's fourth cause of action for negligence; and (6) in favor of CHE and Sacaris and against ICJR on the remainder of the causes of action asserted in ICJR's cross-complaint. The court awarded prejudgment interest in amounts stipulated by the parties and declared that neither side was the prevailing party as it pertained to costs.

## DISCUSSION

A. *The Trial Court Erred in Finding ICJR Failed to Establish a Right to Disgorgement of the Profits CHE and Sacaris Recovered in Breach of Their Duties as Fiduciaries of ICJR*

1. *Additional Background*

The trial court's statement of decision thoroughly details its factual and legal findings relating to ICJR's cross-claim for disgorgement of the profits CHE and Sacaris recovered through their practice of charging and compensating themselves for management services without full disclosure to ICJR. Rather than summarize the court's comprehensive findings, we set forth in full the relevant portions of the court's decision.

"The Court finds that Mr. Sacaris and CHE had fiduciary duties to ICJR from the outset, both as the manager of ICJR's business and later in Mr. Sacaris'[s] role as both ICJR's [COO] and [director]. [Citations.] Both Mr. Sacaris and CHE breached their fiduciary duties from the beginning and throughout the chronology by never disclosing to the Board of Directors,

14

including President[] Dr. Scott, the fundamental, bottom-line, hourly billing rates CHE would and did charge ICJR for its services. Such information should have included Mr. Sacaris's billing rate, the billing rate of any other CHE employees who might work on these conferences, the periodicity of billing, a bottom line charge for overhead, and perhaps a rough calculation of anticipated expenses for conferences in general.

"CHE (Sacaris) was *not* a common independent contractor detached from ICJR with no fiduciary responsibilities. Quite the contrary, Mr. Sacaris had exclusive control of ICJR's finances, exclusive even to ICJR. [Citations.] Mr. Sacaris should have recognized the obvious conflict of interest of both billing for CHE and approving and paying his own bill [on] behalf of ICJR. CHE (Sacaris) should have promptly and regularly provided the ICJR Board with a summary of all CHE invoices and expenses, including the hourly charges of all CHE employees and overhead charges. ICJR should also have received more frequent, perhaps quarterly reports on its financial status. This fiduciary duty was heightened, not abrogated, when Mr. Sacaris became the [COO] and a Non-Voting member of the Board of Directors because in his role as COO the conflict of interest persisted. [¶] . . . [¶]

"Nonetheless, the [c]ourt finds that Mr. Sacaris and CHE as fiduciaries were not required to disclose to ICJR exactly how CHE computed or arrived at the bottom line hourly rate of either Mr. Sacaris or CHE employees. CHE was not required to tell ICJR about the 40 [percent] to 80 [percent] mark-up on CHE's employee hours and the 17-20 [percent] 'overhead' mark-up applied to employee hours billed. Employing common sense and experience, the Court believes that few, if any, service providers provide their clients or customers precise information on how exactly they profit by disclosing details about worker salary, overhead, or product mark-up. Even [fiduciaries] with

15

heightened duties of care, such as investment advisors, and at times, accountants and attorneys do not commonly reveal to their clients exactly how they arrived at their fee structure, their measure of profits, or how overhead charges are calculated.

"Even absent those details, had CHE provided the bottom line employee hourly billing rate, plus any other incidental charges (such as the *amount* charged for overhead) that augmented the bottom line, as well as an estimate of conference expenses, and thereafter provided routine invoices to ICJR, those measures would have triggered ICJR's obligation to scrutinize and investigate any irregularity in the billing and take . . . appropriate action. Yes, ICJR behaved throughout the chronology as if unconcerned about these details, but that did not obviate CHE's (Sacaris's) fundamental fiduciary duty of disclosure.

"As to damages, the [c]ourt heard no evidence that the management services (other than web development) provided by CHE or ICJR and the expenses charged, exceeded what other like service providers would have charged ICJR. Mr. Jason Heath, a former CHE employee[,] testified as to his concerns about the hourly employee mark-ups, concerns that motivated him to warn ICJR of possible overbilling. But Ms. Drozdova, CHE's accountant, testified that all other CHE clients were charged a higher billing rate. Mr. Sacaris testified that his services overall were provided at or below market rate. ICJR presented no expert testimony that would suggest that CHE's billing was extraordinary, except for the web development. Consequently, ICJR did not prove that it suffered any harm or loss. [¶] . . . [¶]

"Without harm or loss, ascertainable or incalculable, without secret profit or tortious gain, no remedy is available for the breach of fiduciary duty.

16

[Citation.] Neither damages for unjust enrichment nor disgorgement are appropriate to this claimed breach of fiduciary duty. There is no proof . . . that the failure to disclose caused harm, an element of . . . breach of fiduciary duty . . . ."

### 2. *Contentions on Appeal*

ICJR contends that once the trial court found CHE and Sacaris breached their fiduciary duties to ICJR, it erred as a matter of law when it held ICJR was required to present evidence it suffered monetary harm or loss from the breach in order to recover.[7] ICJR argues that when a principal seeks disgorgement of a fiduciary's secret profits, the appropriate measure of the damages resulting from the breach of fiduciary duties is the amount of the fiduciary's wrongfully-acquired profits. ICJR maintains that once it established that CHE and Sacaris breached their fiduciary duties, and the amount by which CHE and Sacaris directly and indirectly profited from the breach, under *Meister*, *supra*, 230 Cal.App.4th 381, the court was required to fashion a remedy.

CHE and Sacaris argue the court's decision should be reviewed for an abuse of discretion. They also argue the court correctly determined their profits were not "secret" and therefore not subject to disgorgement.

---

[7] As we have noted, ICJR only challenges the trial court's finding that it failed to establish a right to recovery under its cross-claim for breach of fiduciary duties. ICJR does not dispute the court's determination that CHE and Sacaris were not liable under the other causes of action in the cross-complaint. We limit our review accordingly. (See *Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4 [party deemed to have abandoned a position asserted in the trial court but not renewed on appeal]; accord *Eck v. City of Los Angeles* (2019) 41 Cal.App.5th 141, 146.

3. *Standard of Review*

The trial court's selection of the rule governing ICJR's cross-claim for breach of fiduciary duties raises a question of law that we review independently. (*Kellogg v. Garcia* (2002) 102 Cal.App.4th 796, 802.) ICJR's appeal additionally challenges the court's determination that it failed to sustain its burden of proof on an element of its cross-claim. " 'When the trier of fact has expressly or implicitly concluded that the party with the burden of proof failed to carry that burden and that party appeals, it is somewhat misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment . . . . Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Meister, supra*, 230 Cal.App.4th at p. 395, quoting *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 279.)

4. *Analysis*

We conclude that the trial court erred when it held ICJR could not recover on its cross-claim for breach of fiduciary duties in the absence of evidence it suffered economic harm from the breach. Because ICJR was seeking the equitable remedy of disgorgement of secret profits, not the legal remedy of compensatory damages, ICJR was not required to show it suffered pecuniary harm to establish a right to disgorgement of the profits CHE and Sacaris earned from their misconduct.

18

A claimant pursuing a cause of action for breach of fiduciary duties "ha[s] the right to elect the kind of relief they seek." (*Hicks v. Clayton* (1977) 67 Cal.App.3d 251, 265 (*Hicks*).) The available relief includes damages or any of a "variety of equitable remedies," including disgorgement of profits. (*Meister, supra*, 230 Cal.App.4th at p. 396; *Hicks*, at pp. 264-265; *Haurat v. Superior Court* (1966) 241 Cal.App.2d 330, 334 ["The principal has a cause of action either for a breach of contract or for a tort as a remedy for damage caused by the violation of any duty of loyalty on the part of an agent. He may also charge the agent with anything the agent receives as the result of a violation of duty."].)

The aim of these equitable remedies is to enforce the high standards of conduct to which a fiduciary must be held. "The animating principle of a fiduciary's duties to his charges is unfaltering loyalty and honesty. 'Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the "disintegrating erosion" of particular exceptions [citation]. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd.' " (*Feresi v. The Livery, LLC* (2014) 232 Cal.App.4th 419, 425-426 (*Feresi*), quoting *Meinhard v. Salmon* (1928) 249 N.Y. 458, 464.) " 'When agents and others, acting in a fiduciary capacity, understand that these rules will be rigidly enforced, even without proof of actual fraud, the honest will keep clear of all dealings falling within their prohibition, and those

19

dishonestly inclined will conclude that it is useless to exercise their wits in contrivances to evade it.' " (*Farmers' & Merchants' Bank of Los Angeles v. Downey* (1879) 53 Cal. 466, 468-469, quoting *Bain v. Brown* (1874) 56 N.Y. 285, 288-289.)

Notably, "[d]isgorgement as a remedy is broader than restitution or restoration of what the plaintiff lost." (*Meister*, *supra*, 230 Cal.App.4th at p. 398.) " 'The emphasis is on the wrongdoer's enrichment, not the victim's loss. In particular, a person acting in conscious disregard of the rights of another should be required to disgorge all profit because disgorgement both benefits the injured parties and deters the perpetrator from committing the same unlawful actions again. [Citations.]' " (*Id.* at pp. 398-399, quoting *County of San Bernardino v. Walsh* (2007) 158 Cal.App.4th 533, 542-543 (*County of San Bernardino*).)

Thus, while "[t]he elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach" (*Meister*, *supra*, 230 Cal.App.4th at p. 395), a principal seeking disgorgement of a fiduciary's wrongful gains is not required to prove it suffered economic damage from the breach in order to recover. "Where a person profits from transactions conducted by him as a fiduciary, the proper measure of damages is full disgorgement of any secret profit made by the fiduciary regardless of whether the principal suffers any damage." (*County of San Bernardino*, *supra*, 158 Cal.App.4th at p. 543.) " '[W]here an agent is guilty of concealment or nondisclosure of material facts relating to the subject matter of the agency, he forfeits his right to compensation. *It is not necessary that actual injury to the principal be shown*'

(emphasis added). [Citation.]" (*J.C. Peacock, Inc. v. Hasko* (1961) 196 Cal.App.2d 353, 358 (*J.C. Peacock, Inc.*).)[8]

Instead, where an aggrieved principal seeks disgorgement as a remedy for a breach of fiduciary duties, " '[t]he party seeking disgorgement "has the burden of producing evidence permitting at least a reasonable approximation of the amount of the wrongful gain. . . ." ' " (*Meister*, *supra*, 230 Cal.App.4th at p. 399, quoting *Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 894 (*Uzyel*).) " '[P]rofit includes any form of use value, proceeds, or consequential gains [citation] that is identifiable and measurable and not unduly remote.' " (*Meister*, at p. 399, quoting Rest.3d Restitution and Unjust Enrichment, § 51, subd. (5)(a).) The burden then shifts to the fiduciary to "present evidence of costs, expenses, and other deductions to show the actual or net benefit the [fiduciary] received." (*Meister*, at p. 399.) "[T]he ' "residual risk of uncertainty in calculating net profit is assigned to the wrongdoer." ' " (*Ibid.*, quoting *Uzyel*, at p. 894.)

An action for disgorgement of a fiduciary's wrongful gains is sometimes referred to as seeking recovery of "secret profits." "Secret profits" consist of all benefits an agent acquires from the agency in excess of the agent's agreed compensation. (*Savage v. Mayer* (1949) 33 Cal.2d 548, 551; see *Bardis v. Oates* (2004) 119 Cal.App.4th 1, 11, 13 (*Bardis*) [partner violated partnership

---

8 The Restatement Third of Agency further explains that "[t]he requirement that a principal establish damage is inconsistent with a basic premise of remedies available for breach of fiduciary duty, which is that a principal need not establish harm resulting from an agent's breach to require the agent to account. The requirement may also tempt an agent to undertake conduct that breaches the agent's fiduciary duty in the hope that no harm will befall the principal or that, if it does, the principal will be unable to establish it or unable or unwilling to expend the necessary resources required to litigate the question." (Rest.3d Agency, § 8.01, com. d(2).)

agreement and fiduciary duties by using a "dummy middleman" company to secretly mark up partnership invoices and collect the resulting profits].) Breach of the duties of loyalty and full disclosure may justify forfeiture of all income. (*J.C. Peacock, Inc.*, *supra*, 196 Cal.App.2d at p. 358.) "An agent's breach of fiduciary duty is a basis on which the agent may be required to forfeit commissions and other compensation paid or payable to the agent during the period of the agent's disloyalty." (Rest.3d Agency § 8.01, subd. (d)(2).)

Here, there was no agreement as to the amount of Sacaris's (or CHE's) compensation. Sacaris, on behalf of CHE, nevertheless proceeded to set CHE's rates, and compensate CHE, without adequate disclosure to the board of ICJR. This course of conduct breached the duties of loyalty and full disclosure. As the Restatement Third of Agency explains, "[a]n agent . . . is not free to exploit gaps or arguable ambiguities in the principal's instructions to further the agent's self-interest, or the interest of another, when the agent's interpretation does not serve the principal's purposes or interests known to the agent. This rule for interpretation by agents facilitates and simplifies principals' exercise of the right of control because a principal, in granting authority or issuing instructions to an agent, does not bear the risk that the agent will exploit gaps or ambiguities in the principal's instructions." (Rest.3d Agency, § 1.01, com. e.) Moreover, "[i]f an agent acts on behalf of the principal in a transaction with the agent, the agent's duty to act loyally in the principal's interest conflicts with the agent's self-interest. Even if the agent's divided loyalty does not result in demonstrable harm to the principal, the agent has breached the agent's duty of undivided loyalty." (*Id.*, § 8.03, com. b; see *Trafton v. Youngblood* (1968) 69 Cal.2d 17, 26-28 (*Trafton*) [attorney breached fiduciary duties and gained advantage over client by unilaterally

22

determining his fee and withdrawing funds held in trust to satisfy fee without first notifying client].) By breaching their fiduciary duties and compensating themselves from ICJR's accounts without adequate disclosure or board approval, Sacaris, and thus CHE, risked that some or all of their compensation would be disgorged.

In concluding that ICJR failed to establish a right to recovery, the trial court thus erred in two respects. First, having found that CHE and Sacaris were fiduciaries of ICJR and that they breached their fiduciary duties throughout their relationship with ICJR, the court erred when it held ICJR could not recover for the breach without evidence CHE's and Sacaris's misconduct resulted in it being overcharged for their services. Because ICJR was pursuing the equitable remedy of disgorgement and not the legal remedy of damages, it was not required to prove it suffered such pecuniary damage or loss in order to recover. (*Meister*, *supra*, 230 Cal.App.4th at p. 396 [damages are "the quantification of detriment suffered by a party"].) Instead, ICJR had the burden to prove a "reasonable approximation" of the benefit CHE and Sacaris gained from the breach of their fiduciary duties, a burden which, as we discuss *post*, it sustained.

Second, in concluding that CHE and Sacaris did not recover "secret profits" through the breach of their fiduciary duties, the trial court misperceived the concept of "secret profits." The "secret profits" subject to disgorgement are simply the fiduciary's undisclosed earnings. "There can be no secret profits allowed to the trustee, inasmuch as it owes to the beneficiary the duty of fullest disclosure of all material facts." (*Van de Kamp v. Bank of America* (1988) 204 Cal.App.3d 819, 835; see *Roberts v. Lomanto* (2003) 112 Cal.App.4th 1553, 1570 [broker's $1.2 million assignment fee was "a form of compensation to her that was not disclosed to [her client] until after the sale"

23

and thus was "by definition a secret profit"]; *Crogan v. Metz* (1956) 47 Cal.2d 398, 405 [holding that where "the whole transaction was tainted by a breach of duty" the entirety of the resulting profits "may be recovered as secret profits from those who jointly received it while acting in concert in a fiduciary relationship"].)

The court's conclusion that CHE and Sacaris recovered no "secret profits" from the breach of their fiduciary duties appeared to be derived from its earlier determination that since professionals generally do not share the calculations underlying their hourly rates, CHE and Sacaris were likewise not required to inform ICJR that the rates they charged ICJR for their labor included profit markups of 40 percent to 80 percent and overhead markups of 17 percent to 20 percent. Although on appeal ICJR challenges the court's analogy to the billing practices of other professionals, this misses the point. Whether or not CHE and Sacaris were required to disclose their profit markups *directly* by openly sharing the calculations underlying their hourly rates, the court's findings of breach reflected a determination that they were nevertheless required to disclose the markups *indirectly* by disclosing their hourly rates to ICJR as well as the overall amounts they were charging, and compensating themselves, for their services. It was the failure to disclose *any* of this bottom-line information that made their resulting profits "secret" for purposes of the rules governing disgorgement.

CHE and Sacaris characterize certain comments made by the trial court during a posttrial hearing as reflecting a finding that Scott, and thus ICJR, were generally aware Sacaris and CHE were profiting from their services. However, the findings subject to appellate review are those set forth in court's statement of decision (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981-982), and the trial court's statement of decision contains no such

24

finding. Instead, the court expressly found in its statement of decision that CHE and Sacaris breached their duties by failing to disclose *any* information about the amount of their charges, which encompassed their profits. Moreover, even if the court had made such a finding, ICJR's assumption that CHE and Sacaris were working for a profit did not excuse their failure to disclose their actual fees and charges before compensating themselves from ICJR's accounts. (*Trafton, supra,* 69 Cal.2d at pp. 26-28.)[9]

  5. *Conclusion*

  Once ICJR demonstrated that CHE and Sacaris breached their fiduciary duties, to establish a right to recover in disgorgement, ICJR had the burden of producing evidence " 'permitting at least a reasonable approximation' " of their wrongful gain. (*Meister, supra,* 230 Cal.App.4th at p. 399.) "[T]he unjust enrichment . . . of a defaulting fiduciary without regard to notice or fault, *is the net profit* attributable to the underlying wrong." (Rest.3d Restitution and Unjust Enrichment, *supra,* § 51, subd. (4), italics added.) "This profit-based measure of unjust enrichment determines

---

[9] Several days before oral argument, counsel for CHE and Sacaris submitted a letter under California Rules of Court, rule 8.254(a) and (b), notifying this court of counsel's intention to cite to *DeGarmo v. Goldman* (1942) 19 Cal.2d 755, 764 (*DeGarmo*) during his oral presentation. We reject counsel's request to rely on *DeGarmo* because as a case published in 1942, it falls outside the scope of rule 8.254, which only allows for citations to "new authority." And even if we were to consider *DeGarmo,* it would not alter our decision. The cited portion of the *DeGarmo* opinion relates to the equitable defense of unclean hands, yet there is no indication CHE or Sacaris pursued an unclean hands defense at trial or sought a ruling on the defense in the trial court's statement of decision. Accordingly, the defense is not available to them on appeal. (*Bardis, supra,* 119 Cal.App.4th at p. 13, fn. 6 ["New theories of defense, just like new theories of liability, may not be asserted for the first time on appeal."]; *Moriarty v. Carlson* (1960) 184 Cal.App.2d 51, 57-58.)

recoveries against conscious wrongdoers and defaulting fiduciaries. Recovery so measured may potentially exceed any loss to the claimant." (*Id.*, com. a.) Moreover, " '[p]rofit includes any form of use value, proceeds, or consequential gains [citation] that is identifiable and measurable and not unduly remote.' " (*Meister, supra*, 230 Cal.App.4th at p. 399, quoting Rest.3d Restitution and Unjust Enrichment, § 51, subd. (5)(a).) ICJR submitted uncontradicted evidence in form of its expert accountant's testimony establishing that CHE's and Sacaris's undisclosed charges for management services earned them $1,430,260 in profits from ICJR between 2013 and 2016.[10] Under the foregoing rules, this evidence was sufficient to meet ICJR's burden of proof and establish a right to a recovery.

" 'Judicial discretion to grant relief becomes judicial duty to grant it under some circumstances, and the grace which equity should bestow then becomes a matter of right . . . .' " (*Meister, supra*, 230 Cal.App.4th at p. 396, quoting *Hicks, supra*, 67 Cal.App.3d at p. 265.) Having met its burden of proof, ICJR was entitled to have the trial court fashion a remedy. The court never reached this point because it erroneously concluded ICJR had failed to establish a right to recovery.

ICJR requests that rather than remand to the trial court for further proceedings, that we modify the judgment to award ICJR $1,430,260 on this claim and affirm the modified judgment. "Whenever an appellate court may make a final determination of the rights of the parties from the record on appeal, it may, in order to avoid subjecting the parties to any further delay or expense, modify the judgment and affirm it, rather than remand for a new determination." (*Sagadin v. Ripper* (1985) 175 Cal.App.3d 1141, 1170.) Although ICJR correctly asserts that its profit figure of $1,430,260 was

---

10     See footnote 6, *ante*.

uncontroverted, it does not necessarily follow that we can make a final determination that ICJR is entitled to recover this amount. The trial court possesses substantial discretion to balance the equities and fashion the award it deems appropriate. We will therefore remand so the court can conduct such further proceedings as it deems necessary to enable it to exercise its discretion in the first instance and determine the amount of profits to be disgorged from CHE and Sacaris.

To guide the trial court upon remand, we note the following. First, while the court retains considerable discretion to determine the appropriate amount of an award of disgorgement, its discretion is not unfettered. " ' "[T]he public policy of this state does not permit one to 'take advantage of his own wrong' " regardless of whether the other party suffers actual damage.' " (*Meister*, *supra*, 230 Cal.App.4th at p. 398, quoting *County of San Bernardino*, *supra*, 158 Cal.App.4th at p. 542.) Disgorgement is meant, in part, to have a deterrent effect and ensure fiduciaries are held to a standard " 'stricter than the morals of the market place.' " (*Feresi*, *supra*, 232 Cal.App.4th at p. 426.) The court's statement of decision is a scathing indictment of years of misconduct by Sacaris and CHE. On this record, denying ICJR a recovery altogether would fail to recognize the seriousness of their wrongdoing and would fall short of achieving the goal of deterring future misconduct.

Second, if the court, in the exercise of its discretion, wishes to consider reducing ICJR's recovery by amounts it finds CHE and Sacaris can retain without being unjustly enriched, it is CHE and Sacaris, and not ICJR, who bear the burden to present evidence demonstrating the reasonableness of the amounts they charged ICJR for their management services. (*Meister*, *supra*, 230 Cal.App.4th at p. 399.) The testimonial assertions of Sacaris and

Drozdova offered at trial regarding the reasonableness of CHE's hourly rates failed to fully address this issue. The reasonableness of professional charges is more than a matter of hourly rates. Professional invoices can also be inflated by overstaffing and by billing an unreasonable number of hours, among other practices. (See generally State Bar of Cal., Com. on Mandatory Fee Arbitration, Arbitration Advisory 2016-02, Analysis of Potential Bill Padding and Other Billing Issues (Mar. 25, 2016).) Furthermore, because CHE and Sacaris are assigned the "residual risk of uncertainty" in the determination of profits subject to disgorgement (*Uzyel*, *supra*, 188 Cal.App.4th at p. 894), any doubts as to the reasonableness of their charges must be resolved in favor of ICJR.

B. *Pharmaceutical Symposia*

The trial court found CHE and Sacaris breached their fiduciary duties by failing to disclose to the board of ICJR that they were managing the pharmaceutical company symposia that took place during ICJR conferences and profiting by doing so, and by failing to obtain board approval for their engagement. However, the court concluded that running the symposia was not a corporate opportunity ICJR would have taken for itself, and that ICJR was therefore not harmed by, and could not recover for, the nondisclosures.

On appeal, ICJR focuses on its purported right to recovery under the corporate opportunity doctrine.[11] ICJR disputes the court's determination

---

11    The fiduciary duty of full disclosure and fiduciary duty to avoid usurpation of corporate opportunities are distinct obligations. (See 3 Fletcher Cyc. Corp. (Sept. 2019) §§ 861.10 [Corporate opportunity doctrine], 837.70 [Duty of full disclosure].) ICJR does not challenge whether, having found Sacaris and CHE responsible for breach of the fiduciary duty of disclosure, the court's harm analysis should have focused on the harm that flowed from the nondisclosure, which is not necessarily identical to the harm created by ICJR's loss of a corporate opportunity. (See *Meister*, *supra*, 230 Cal.App.4th

28

that the symposia were not within ICJR's line of business and argues the court ignored evidence that CHE used ICJR's resources (including hotel conference rooms booked by ICJR and medical faculty enlisted by ICJR to lead conference seminars) to put on the symposia. Citing several out-of-state cases, ICJR contends this evidence compelled the conclusion that the symposia were an ICJR corporate opportunity that CHE and Sacaris wrongfully usurped.

The corporate opportunity doctrine "prohibits one who occupies a fiduciary relationship to a corporation from acquiring, in opposition to the corporation, property in which the corporation has an interest or tangible expectancy or that is essential to its existence." (3 Fletcher Cyc. Corp. (Sept. 2019) Corporate Opportunity Doctrine, § 861.10.) Whether or not a given corporate opportunity was wrongfully usurped is a question of fact to be determined from the facts and surrounding circumstances existing at the time the opportunity arises. (*Kelegian v. Mgrdichian* (1995) 33 Cal.App.4th 982, 989 ["California recognizes this [corporate opportunity] doctrine and also recognizes that whether or not a corporate opportunity exists is primarily a factual question"].) " 'Three tests have been recognized as standards for identifying a corporate opportunity: the "line of business" test, the "interest or expectancy" test, and the "fairness" test. Under any test, a corporate opportunity exists when a proposed activity is reasonably incident to the corporation's present or prospective business and is one in which the corporation has the capacity to engage . . . . [Citation.]' " (*Id.* at p. 988.)

_____

at p. 401 ["[T]he remedy chosen by the trial court must be linked to a particular breach of fiduciary duty . . . ."].) Accordingly, we do not address this issue.

Substantial evidence supported the trial court's determination that managing the pharmaceutical company symposia was not an ICJR corporate opportunity. The court reasoned there was no indication ICJR "would have been remotely interested" in producing the symposia and would have had to outsource management of the symposia to another event planning organization if not CHE. This reasoning was grounded in the trial evidence, including the testimony of Dr. Scott, who testified ICJR did not have the necessary personnel or expertise to plan or produce educational conferences without outside help. ICJR concedes as much, arguing it "was capable of engaging vendors to run its other symposia" and had "the capacity to do the same here."

Contrary to ICJR's assertions, CHE's use of ICJR resources to run the symposia did not, on its own, compel the conclusion the symposia were an ICJR business opportunity. The out-of-state cases on which ICJR relies stand for the proposition that a corporate fiduciary who uses corporate funds or other assets to develop a corporate opportunity will be estopped from arguing the corporation lacked sufficient money or resources to develop the opportunity. (*Guth v. Loft* (1939) 23 Del.Ch. 255; *Graham v. Mimms* (1982) 111 Ill.App.3d 751; *In re Trim-Lean Meat Products, Inc.* (Bankr. Del. 1980) 4 B.R. 243, 247 (*Trim-Lean*).) These cases nevertheless adhere to the rule that "[t]he basic question in all cases is whether the director has appropriated something for himself that, in all fairness, should belong to the corporation." (*Trim-Lean*, at p. 247.)

ICJR's argument and cited authorities fail to establish that the trial court erred. The court's determination that the symposia did not present a business opportunity for ICJR was not based on its lack of available resources so much as its lack of demonstrated corporate ability or interest in planning

30

educational conferences for any companies, including itself. Estopping CHE and Sacaris from disputing whether ICJR had sufficient resources to run the symposia would not change the conclusion that the symposia were not a venture that "in all fairness, should belong to" ICJR. (*Trim-Lean*, *supra*, 4 B.R. at p. 247.)[12]

Accordingly, the trial court did not err in determining that producing symposia for pharmaceutical companies was not an ICJR corporate opportunity.

## DISPOSITION

The portion of the judgment finding in favor of CHE and Sacaris and against ICJR on ICJR's cross-claim for breach of fiduciary duty (first cause of action), pertaining to amounts CHE and Sacaris billed for management services, is reversed. The matter is remanded to the trial court for further proceedings to determine the amount to be awarded to ICJR on this claim. In

---

[12] CHE's unapproved use of ICJR's assets was nevertheless potentially actionable. (See, e.g., 3 Fletcher Cyc. Corp. (Sept. 2019) § 1102 ["[D]irectors and other corporate officers are liable for misappropriation, diversion or conversion of corporate assets."].) Here, however, the record does not reflect that ICJR pursued recovery of the purportedly misappropriated assets, except insofar as it claimed CHE's use of such assets demonstrated the symposia were a corporate opportunity.

all other respects, the judgment is affirmed.  Each side is to bear its own costs on appeal.


McCONNELL, P. J.

WE CONCUR:


BENKE, J.


IRION, J.